# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

| | | |
|---|---|---|
| JENNIFER OLDHAM, | : | |
| Plaintiff | : | Case No. |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF NORTH CAROLINA; | : | |
| LAWRENCE R. CUNNINGHAM, Individually | : | |
| and as Agent for UNC; LORENZO GALLO, JR., | : | |
| Individually and as Agent for UNC; RONALD | : | |
| MILLER, Individually and as Agent for UNC, | : | |
| Defendants. | : | Electronically Filed |

## COMPLAINT

This case conjures up an image of a dark, private, back room in an exclusive club or fraternity where secret discussions are had to do something dishonorable and wrong. Blackballing is always accomplished in a secret or covert manner. Blackballing is always dishonorable and always wrong. In this instance it was also unlawful, causing Jennifer Oldham substantial harm and damage.

Defendants University of North Carolina[1], Cunningham, Gallo, and Miller unlawfully discriminated against and blackballed Oldham from employment with

---

[1]     The University of North Carolina System's flagship campus is in Chapel Hill, North Carolina. Unless otherwise noted, "UNC" herein refers to the UNC-Chapel Hill campus.

the UNC athletics department in retaliation for her lawful participation in protected activities; and engaged in discriminatory, defamatory, and retaliatory acts related to Oldham as a female victim of sexual harassment, an investigation complainant, and as a UNC whistleblower, to her significant personal and professional detriment.

Plaintiff Jennifer Oldham, by and through her attorneys, based upon knowledge of her own acts and upon information and belief as to the acts of others, respectfully alleges as follows:

## JURISDICTION AND VENUE

1. Oldham brings this action to seek redress for discrimination and retaliation based on gender and/or sex by the Defendants, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) (1972). Accordingly, Oldham invokes this Court's federal question jurisdiction conferred by 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

2. Oldham also brings this action to seek redress for employment discrimination by the Defendants based on her sex, and for retaliation against her for engaging in protected activities, to wit, reporting one or more instances of sexual harassment and discrimination, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (1964). Accordingly, Oldham invokes this Court's federal

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 2 of 51

question jurisdiction conferred by 28 U.S.C. § 1331, which gives district courts original jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

3.    Because this Court has jurisdiction to address the controversy before it, 28 U.S.C. § 2201 grants the Court authority to declare the rights of the parties before it, and 28 U.S.C. § 2202 authorizes the Court to grant such further relief, including injunctive relief, as the Court may deem necessary and proper.

4.    Plaintiff also states causes of action under the laws of the State of North Carolina because the Defendants have violated rights secured thereunder. Oldham's state claims include invasion of privacy (offensive intrusion), defamation, negligent infliction of emotional distress, civil conspiracy, negligent training and supervision, negligence, and gross negligence. Those causes of action are so related to the federal claims in this case, over which this Court has original jurisdiction, that they form a part of the same case or controversy under Article III of the United States Constitution. Accordingly, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.

5.    Defendant UNC is a legal entity organized and operating primarily in Orange County, North Carolina.

6.    Defendants Cunningham is, upon information and belief, a resident of Orange County, North Carolina.

7.     Defendant Gallo is, upon information and belief, a resident of Chatham County, North Carolina.

8.     Defendant Miller is, upon information and belief, a resident of Wake County, North Carolina.

9.     Plaintiff Oldham is a resident of Durham County, North Carolina.

10.    Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events, acts, or omissions giving rise to Oldham's action occurred in Orange County, North Carolina.


## PARTIES

11.    Plaintiff Jennifer Oldham is the female owner and head coach of Forge Fencing Teams, a private fencing club and state-of-the-art training facility in Durham, Durham County, North Carolina. Oldham is a 1996 UNC graduate, a 1993-96 UNC varsity women's fencing team member coached by Defendant Miller, and a former volunteer assistant fencing coach at UNC. Oldham has fenced competitively nationally and internationally, is an accomplished and acclaimed professional fencing coach and referee nationally and internationally, and is certified as a Maitre d'Armes (M. d'A) by the Academie D'Armes Internationale. At all relevant times herein, Oldham was an applicant for employment at UNC.

12.     Defendant UNC is the flagship campus of the University of North Carolina System's 16-campus state-run public university system, located in Chapel Hill, Orange County, North Carolina.

13.     Defendant Lawrence J. "Bubba" Cunningham was hired as UNC's Chief Athletics Administrator in 2011 and was at all relevant times herein UNC's Athletic Director, classified by UNC as a responsible employee[2]. Cunningham's duties included administrative and operational oversight of all athletes, athletics staff, and NCAA Division I team sports activities and compliance at UNC.

14.     Defendant Lorenzo "Larry" Gallo, Jr. was hired by UNC in 1997, and was at all relevant times herein UNC's Deputy Chief Athletics Officer or Executive Associate Athletics Director, reporting to Cunningham, and classified by UNC as a responsible employee. Gallo's Executive Associate Athletics Director duties included overseeing the hiring of coaching staff in the fencing program in 2018.

15.     Defendant Ronald Miller was at all relevant times herein, the Head Coach of UNC's fencing program, reporting to Cunningham, and classified by UNC as a responsible employee. Miller had been employed by UNC since 1967. His head

---

[2]     UNC "responsible employees" are those with administrative or supervisory responsibilities on campus or who have been designated as Campus Security Authorities. This includes members of the Board of Trustees, the Chancellor, Vice Chancellors, Deans, Directors, Department Chairs, and Coaches. See *Policy on the Prohibition of Discrimination, Harassment and Related Misconduct* ("PPDHRM"), Sec. VIII.A.

coaching duties included administration and development, athlete recruitment and training, and supervision of assistant coaches and trainers.

## APPLICABLE LAW AND POLICY

16.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

17.     Title IX is implemented through the Code of Federal Regulations. See 34 C.F.R. Part 106.

18.     "Title IX contains an implied private right of action permitting aggrieved parties to sue educational institutions for alleged violations. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 713 (1979)." *Davis v. Univ. of N.C. at Greensboro* (M.D.N.C. 2020).

19.     While North Carolina's three-year statute of limitations generally governs Plaintiff's claims, federal law determines when her federal law claims accrued. Discrimination claims accrue "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc)

(citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

20. "When there is a 'continuing course of racially discriminatory conduct, the date of the last discriminatory act determines a suit's timeliness.' *Bradley v. Carydale Enters.*, 707 F.Supp. 217, 220 (E.D. Va. 1989) (internal quotations omitted) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381-82 (1982))." *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

21. "[T]o establish a continuing violation … the plaintiff must establish that the unconstitutional or illegal act was a … fixed and continuing practice." *Nat'l Advert. Co.,* 947 F.2d at 1166. A fixed and continuing practice exists where "the same alleged violation" is repeated by the same actor in "a series of separate acts." *Id*. at 1167 (quoting *Perez v. Laredo Junior Col*., 706 F.2d 731, 733 (5th Cir. 1983)). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

22. Two acts may be the same "violation" of federal discrimination laws even where the facts giving rise to the violation are quite different. *See, e.g., Bradley*, 707 F.Supp. at 219, 221 (finding a landlord's refusal to intervene to protect a tenant from racial harassment and subsequent effort to force her to vacate her home were a single violation of Title VI). *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 7 of 51

23.    Courts consider two factors to determine whether an act was a fixed and continuing practice, including "(1) the harm to the plaintiff and whether that harm has been compounded by further governmental actions and (2) whether unfairness results from finding the continuing wrong exception inapplicable." *Miller v. King George Cty.*, 277 Fed.Appx. 297, 299 (4th Cir. 2008); *see Nat'l Advert. Co.*, 947 F.2d at 1167-68. "It is continual unlawful acts, not continual ill effects from an original violation, that constitutes a continuing course of racially discriminatory conduct." *A Soc'y Without A Name*, 655 F.3d at 348. *See also McCarter v. The Univ. of N. Carolina At Chapel Hill* (M.D.N.C. 2021).

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

24.    On a December 2017, commercial airline flight, while returning from a national fencing tournament, Penn State assistant fencing coach George Abashidze thrust his hand between Jennifer Oldham's legs and grabbed her genitalia without her consent.

25.    Penn State head fencing coach Wieslaw Glon learned of Oldham's sexual assault by Abashidze in January 2018. Glon failed to report it to Penn State or the United states Center for SafeSport[3] as required and used his prominent stature

---

[3] SafeSport is a 501(c)(3) created by the "Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017." The Act authorized SafeSport as a quasi-judicial entity to create and enforce policies and procedures,

in the fencing community to harass Oldham over a period of several months trying to intimidate her so she would not cooperate with the SafeSport investigation and not file complaints with Penn State about Abashidze's assault.

26.     An individual who had witnessed Abashidze's harassment of Oldham on the plane reported the incident to SafeSport in January 2018.

27.     In February 2018, Glon communicated with Defendant Miller and asked him "is there anything you can do about Jennifer?"

28.     Glon continued to harass and intimidate Oldham and in February 2018 told her that no one would believe that Abashidze had sexually assaulted her, that Abashidze was a nice guy and would never assault anyone, and that she would be publicly embarrassed if assault details became known.

29.     Between January and May 2018, Glon communicated with his friend Miller telling him that he did not believe Oldham's claim, that Abashidze was a nice guy and would never assault anyone, and that he was concerned about the SafeSport investigation and its potential grave consequences for Abashidze.

_____

and to develop training to prevent and respond to sexual, physical, and emotional abuse and misconduct for more than 11 million individuals in the United States Olympic and Paralympic Sports Movement, including those who are associated with USA Fencing and participate in the sport of fencing. See: https://uscenterforsafesport.org/ (last retrieved June 27, 2022).

30.     In April 2018, at a tournament at Duke University, Glon told Oldham he would not report her claim of sexual assault by Penn State's assistant fencing coach to the administration at Penn State.

### *May 2018: UNC Head Fencing Coach Position Search*

31.     Defendant Miller announced his plan to retire as head fencing coach at the end of the 2018 season, after 51 years at UNC.

32.     Between May and August of 2018, Glon communicated with Miller, sharing his continued disbelief in the details of Oldham's sexual assault claim, and his concerns about the potential grave consequences for Abashidze of SafeSport's decision and Penn State's Title IX outcome.

33.     On May 2, 2018, the head fencing coach position was posted on UNC's employment website.

34.     Oldham applied for UNC's head fencing coach position, submitting her curriculum vitae and a number of recommendation letters from fencing professionals including Peter Burchard, now President-elect of USA Fencing.

35.     On 4 June 2018, Oldham was interviewed with other finalists for the head coach position by a hiring panel assembled by Gallo.

36.     Miller discussed Oldham's application with Gallo and/or Cunningham and told one or both of them about her claim that Abashidze had sexually assaulted her and the SafeSport investigation.

37.     Between 28 June and 2 July 2018, Miller spoke with Peter Burchard at the 2018 USA Fencing National Championships and told Burchard that Oldham "would never get the job" at UNC.

38.     On 30 June 2018, Oldham's husband reported her sexual assault to Penn State's Athletics Director, confirmed that Penn State had not previously heard about the assault, and a Title IX investigation was begun.

39.     On August 1, 2018, SafeSport issued a report finding Abashidze responsible for Oldham's sexual assault. Abashidze was suspended from association with USA Fencing-sanctioned events and affiliates and as a result he was terminated by Penn State.

40.     In August 2018, Penn State's investigation of Oldham's claim concluded that Abashidze had sexually assaulted Oldham – and yet inexplicably determined that he had not violated any Penn State policies.

41.     On or about August 14, 2018, Cunningham was prepared to announce that Joshua Webb, a male UNC fencing alumnus and an assistant coach who had been with the program for several years, would be hired as UNC's new head coach.

42.    On or around August 14, 2018, Cunningham received a phone call with UNC whistleblower[4] information suggesting he ask Webb if he had engaged in possible wrongful conduct of a sexual nature with a student-athlete while employed by UNC.

43.    Cunningham and/or Gallo and/or Miller met with Webb and asked if he had engaged in possible wrongful conduct of a sexual nature with a student-athlete while employed by UNC.

44.    Webb admitted to Cunningham and/or Gallo and/or Miller that he had engaged in possible wrongful conduct of a sexual nature with a student-athlete while employed by UNC.

45.    On or around August 15, 2018, Cunningham participated in one or more phone calls to gain additional information about what he referred to as the whistleblower's "end game."

46.    On or around August 15, 2018, UNC's offer to hire Webb as the new head fencing coach was rescinded and his employment as an assistant coach was terminated.

---

[4]    UNC's "Whistleblower Policy" became effective on 31 July 31, and protects whistleblowers including employment applicants from adverse employment actions at UNC. The policy is independent of any North Carolina or federal law. See https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131868    (last retrieved on June 27, 2022).

47.    Oldham was told on 15 September 2021, that in August 2018, no information regarding Webb's possible sexual misconduct was reported to UNC's Equal Opportunity and Compliance office ("EOC") staff, as federal law and multiple UNC policies required of Cunningham, Gallo, and Miller as responsible employees.

48.    On 23 August 2018, at 5:39 p.m., Oldham received an email with "07/27/2016 11:54 AM" at the top of the body of the email, from no_reply@unc.edu, notifying her that she was no longer being considered for an assistant fencing coach position she had applied for in 2016, a position that had been held by Will Randolph, a male UNC fencing alumnus, since 2016.

49.    On August 27, 2018, Miller told Oldham in an email that everyone who had applied for the head coach position in May would "automatically be re-considered."

50.    In late August 2018, Miller shared details of the questioning of Webb, along with his speculation that Oldham was the whistleblower and the cause of Webb's professional downfall, with others in the fencing community.

    a. On or about August 29, 2018, in Chapel Hill, North Carolina, Miller shared information with his spouse, Susun Miller, that she then published in a self-described "rant" visible to over 1,100 of Ron Miller's Facebook friends about "folks who sabotage" jobs, referencing the "devious" "two-faces" of those "who play the role

of 'poor me' victim" and threatening that the unnamed saboteur would face "a judge and jury."

b.  In approximately September 2018, at UNC, Miller spoke with UNC volunteer assistant coach Jim Murray about Webb's termination. Murray then spoke with a USA Fencing board member Don Alperstein in January 2019 at a North American Cup fencing tournament in Charlotte, North Carolina and told him: "they sat [Webb] in a room, asked if he'd slept with an athlete and said thank you very much, and that was it."

c.  Miller told the SafeSport investigator that in approximately October 2018, Miller spoke about Oldham with "15 to 20 people" at an NAC event in Milwaukee and inferred a nefarious connection between Oldham wanting the head coach job and his position that "[the whistleblower] could have been her but there's no way to know."

d.  Also in approximately October 2018, Miller told Peter Burchard, then President of the United States Coaching Association, that Oldham was "fumbling with [his] coaching line-up."

*September 2018: UNC Head Fencing Coach Position Search*

51.     In September 2018, the head fencing coach position was re-posted on UNC's employment website.

52.     Miller planned to remain as UNC's head coach through the end of the 2018-19 season.

53.     On 6 September 2018, Oldham submitted an updated curriculum vitae that included her most recent professional accolades and formally re-applied online for the head coach position.

54.     Oldham received no acknowledgment or response from UNC to her September formal application for the head coach position.

55.     In September 2018, Gallo discussed the hiring process with then-UNC head coach position candidate Ariana Klinkov, now the head coach at Cornell. Gallo told Klinkov that she would not be hired despite her excellent qualifications and offered to write a letter of recommendation for her for the head coach position at the Air Force Academy. Gallo shared with Klinkov that she would not be hired because the internal plan was that UNC would only consider hiring a male UNC fencing alumnus as head coach.

56.     In April 2019, Matt Jednak, a male UNC fencing alumnus, was announced as the new head fencing coach.

### *September 2018: UNC Assistant Fencing Coach Position Search*

57.    In September 2018, a job opening for the assistant fencing coach position previously held by Webb was posted on UNC's employment website.

58.    On or about 5 September 2018, Oldham submitted a curriculum vitae that included her most recent professional accolades and formally applied online for the assistant coach position.

59.    In September 2018, believing she was being considered for the open head coach and assistant coach positions, Oldham asked Miller if she could observe and/or assist with team practices. Miller declined her requests.

60.    On 21 February 2019, Oldham received an email from UNC telling her the assistant coach position she had applied for had been "cancelled."


### *26 June 2019: Defendant Miller's SafeSport Interview Statements*

61.    In April 2019, Oldham requested that SafeSport and Penn State conduct investigations into Glon's failure to report his knowledge of Oldham's assault as their respective policies required.

62.    On 16 August 2021, SafeSport gave Oldham access to their completed investigation report and Oldham learned that SafeSport had interviewed Miller on 26 June 2019.

63.     On 26 June 2019, Miller made the following statements to the SafeSport investigator:

   a.   Miller first heard of SafeSport's Abashidze investigation when Glon called him in 2018 upon returning from an international tournament;

   b.   Miller said Glon believed Oldham was trying to discredit Penn State to improve her chances of getting a job at Penn State or UNC;

   c.   Miller said he believed Oldham was involved in UNC rescinding Webb's offer of employment;

   d.   Miller said he believed Oldham was the whistleblower because Cunningham had implied the whistleblower was a UNC alumnus;

   e.   Miller said Cunningham and Gallo had concerns that Oldham was "untrustworthy" due to their belief that she provided the whistleblower information;

   f.   Miller said that after Cunningham received the whistleblower information, Cunningham and/or Gallo said they would not consider Oldham for any employment in the UNC athletic department;

   g.   Miller said Oldham's assault and presumed whistleblowing "'probably did' have an impact on Oldham not getting the job" in September 2018; and

h.  Miller's working relationship with Oldham became strained because he didn't believe her assault claim.

64.    Miller, a male UNC employee, was not retaliated against by UNC and did not suffer any adverse employment action as a result of participating in the SafeSport investigation and making the above statements.

**Oldham's Efforts to Seek Redress**

65.    On 15 September 2021, Oldham complained to UNC's Equal Opportunity and Compliance ("EOC") office of possible violations of UNC's anti-discrimination, anti-retaliation, and whistleblower policies by Cunningham, Gallo, and Miller.

66.    On 16 September 2021, Oldham complained to SafeSport of potential sex and gender discrimination and retaliation policy violations by Miller, based on his statements in the 26 June 2019 SafeSport interview.

67.    On 18 October 2021, Oldham participated in a 2-hour interview with UNC EOC investigators about her complaint.

68.    On 5 April 2022, Oldham received a "Notice of Right to Sue" letter from the United States Equal Employment Opportunity Commission related to her claims of sex discrimination and retaliation by UNC.

*Injuries to Plaintiff Oldham from Defendants' Course of Conduct*

69.     The SafeSport investigations of Abashidze and Glon prompted Abashidze and Glon to spread false and damaging rumors about Oldham to Miller and others in the national fencing community.

70.     Miller shared the false and damaging rumors about Oldham with Gallo, Cunningham, and others in the local and national fencing community.

71.     The negative impact of those false and damaging rumors on Oldham's well-being and reputation in the fencing community was magnified when Miller falsely told others he believed Oldham provided the information to Cunningham that led to Webb not being hired.

72.     Oldham has been subjected to acts of harassment and retaliation via email, on social media, and in person at regional, national, and international fencing competitions, and at other official fencing events and social gatherings.

73.     Due to the failures of Cunningham, Gallo, and Miller to comply with UNC's anti-discrimination and anti-retaliation policies and processes, their obstruction of UNC's ability to respond to the report about Webb in a timely and meaningful manner, and their untrue and defamatory statements about her, Oldham:

         a.  Has been subjected to a hostile environment in UNC programs and activities, to wit, fencing programs and events at which Miller and/or Webb's supporters, friends and family participate;

b. Has been falsely accused of maliciously causing Webb to lose the head coach job opportunity at UNC;

c. Reduced her attendance at national- and international-level tournaments, as well as at local fencing activities, workshops, and collegiate recruitment events due to her apprehension of encountering Glon, Abashidze, Miller, Webb, or those they have influenced with false statements about her to the detriment of her business, family, and wellbeing;

d. Suffered from a lack of concentration and a decreased ability to perform work tasks due to the enormous distraction caused by these circumstances;

e. Suffered stress due to managing the anxiety these events have caused her husband and children, who are also active in the sport of fencing, to experience;

f. Suffered feelings of depression, despair, fear, humiliation, and loss of professional confidence, as well as feelings of intense grief at the loss of friendships, and feelings of betrayal by former friends, teammates, colleagues, professional peers, and her former coach and mentor, Defendant Miller.

74.    Due to the lofty professional stature of each defendant and their deliberate failure to comply with the federal Title IX institutional non-retaliation law and with UNC's whistleblower non-retaliation policies, Defendants were able to pursue their retaliatory campaign against Oldham unencumbered by any university oversight, fostering the hostile environment at UNC and elsewhere that plagues Oldham to this day.

75.    Oldham has suffered, and continues to suffer injuries to her reputation, her livelihood, her career potential, and her psychological well-being.

76.    Oldham has been subjected to a hostile environment for both herself and her students in relation to UNC's fencing program, events, and activities, effectively excluding her from fencing and alumni events hosted by UNC, a frequent host of fencing tournaments, workshops, and recruitment opportunities for the prospective NCAA Division I student-athletes she coaches at her private club.

77.    As a result of the hostile environment Defendants created for Oldham in UNC programs and benefits, she has diminished employment prospects and has lost her previously unencumbered access to competitive fencing events and professional development opportunities.

78.    Oldham has spent considerable time, effort, and resources to navigate these circumstances to protect herself, her students and paying club members, and her club's reputation from anticipated retaliation, in that she reasonably fears UNC,

and other NCAA fencing programs headed by friends of the Penn State and UNC coaches will not recruit or offer scholarships to her student-athletes, thus reducing the professional appeal of her fencing club to those athletes and their families.

79.     Defendants' collective actions have effectively excluded Oldham from, denied her the benefits of, and subjected her to discrimination in UNC programs, events, and activities that she had previously participated in, benefitted from, and enjoyed as a UNC fencing team alumnus and UNC graduate.

## COUNT I
### Violation of Title IX (Discrimination/Retaliation)
### 20 U.S.C. § 1681, et seq.
(v. UNC; Cunningham, as Agent for UNC;
Gallo, as Agent for UNC; and Miller as Agent for UNC)

80.     All Paragraphs of this pleading are incorporated herein by reference.

81.     Title IX prohibits discrimination on the basis of sex in a school's educational programs or activities, which include all of the school's operations. 20 U.S.C. §§ 1681(a), 1687.

82.     UNC receives federal grant funding and/or has students who receive federal student financial aid, and thereby is a recipient of federal funds and must comply with Title IX.

83. A victim of discrimination based on her sex has a private right of action under Title IX against the offending school for monetary damages and equitable relief.

84. UNC, Cunningham, Gallo and Miller discriminated against Oldham when they capriciously decided the head coach position would only be filled by a "male UNC fencing alumnus."

85. Title IX includes an implied right of action protecting those who are retaliated against for reporting sexual discrimination. *Jackson v. Birmingham Bd. of Educ,* 544 U.S. 167, 183-84 (2005).

86. Discrimination under Title IX occurs "when a funding recipient retaliates against a person because [s]he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. of Educ,* 544 U.S. 167, 174 (2005).

87. Retaliation under Title IX occurs "when a funding recipient retaliates against a person because [s]he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson*, 544 U.S. 167, 174 (2005).

88. A prima facie retaliation claim must show (1) engagement in a protected activity; (2) an adverse action; and (3) a causal connection between the protected activity and the adverse action. *See Coleman v. Md. Court of Appeals*, 626

F.3d 187, 190 (4th Cir. 2010) (applying this retaliation framework to Title VII claims), *Davis v. Univ. of N.C. at Greensboro* (M.D.N.C. 2020)

89.     Oldham was subjected to acts of retaliation and discrimination on the basis of her sex by Cunningham, Gallo, and Miller while they were in the furtherance of their UNC employment duties in 2018.

90.     Miller engaged in retaliatory acts against Oldham for filing a sexual assault claim against Abashidze in 2018 when he initially told Cunningham and Gallo about his disbelief in her claim.

91.     Defendants retaliated against Oldham in the UNC hiring process between May and September 2018, when they discussed Glon and Miller's disbelief in Oldham's sexual assault claim and capriciously concluded that Oldham's engagement in the protected activities of participating in the SafeSport and Penn State sexual assault investigations reflected poorly on her trustworthiness as a potential UNC employee.

92.     UNC, Cunningham, and Gallo, retaliated against Oldham in August 2018 when they discussed their belief that she engaged in the protected activity of providing whistleblower information to UNC and capriciously concluded that such activity reflected poorly on her trustworthiness as a potential UNC athletic department employee.

93.     UNC, Cunningham, Gallo, and/or Miller concealed the whistleblower information from the UNC EOC office, contrary to federal law and UNC policies, and thereafter retaliated against Oldham by using their belief that she had engaged in this protected activity against her in their hiring discussions and decisions.

94.     UNC, Cunningham and Gallo discriminated and retaliated against Oldham when Cunningham and Gallo disclosed to Miller that Oldham would not be considered for future employment in the UNC athletic department, thereby blackballing Oldham from employment in the UNC athletic department in order to avert negative publicity for UNC, additional public scorn for the UNC athletics department under Cunningham's watch, and other harmful professional and personal consequences for Cunningham, Gallo, and/or UNC.

95.     Defendants discriminated and retaliated against Oldham for her participation in protected activities, based on her sex, and on female gender stereotypes, and grounded in a female gender bias that a female who reports being sexually assaulted or reports the questionable actions of a male employee will be untrustworthy or pose a threat to them in the future, a female gender bias formed by and viewed through the lens of their collective male privilege.

96.     Defendants engaged in a series of concerted actions and inactions that concluded with Oldham being barred from consideration for UNC employment

based on Defendants' perceptions of her as a sexual assault victim and a UNC whistleblower who represented a threat to the UNC fencing team's male status quo.

97.    Defendants took advantage of the extraordinary imbalance of power and privilege between Defendants and Oldham to retaliate against, defame, shame and otherwise discriminate against Oldham based on her status as a female sexual assault victim to her great detriment, contrary to UNC policies and federal law.

98.    Defendants' decisions not to report the whistleblower information, which they had attributed to Oldham, to UNC's EOC office, as each had a duty to do, were willfully erroneous and contrary to UNC policy and federal law – and were transparent attempts to avoid negative professional consequences for all Defendants and preserve the status quo at Oldham's expense.

99.    In a Title IX retaliation claim, a Title IX plaintiff 'will have to prove that the [funding recipient] retaliated against [her] because [she] complained of sex discrimination') ..." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 184, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005). See *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230 (4th Cir. 2021)

100.   Title IX, which "prohibits sex discrimination by recipients of federal education funding" is a "broadly written general prohibition on discrimination." *Jackson*, 544 U.S. at 173, 175, 125 S.Ct. 1497. The question in *Jackson* was whether Title IX's implied private right of action encompasses claims of retaliation. The

Court held that it did, relying on its "repeated holdings construing 'discrimination' under Title IX broadly," Congress's awareness of precedent issued shortly before Title IX's passage, the absence of language limiting the statute to "discrimination on the basis of such individual's sex," and Congress's purposes in enacting the statute. *Jackson*, 544 U.S. at 173–181, 125 S.Ct. 1497, *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

101. "20 U.S.C. § 1681(a) is enforceable through an implied private right of action." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 703, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). *Sheppard v. Visitors of Va. State Univ*., 993 F.3d 230 (4th Cir. 2021)

102. "That language — "on the basis of sex" — is significant. While admittedly not yet addressed in the context of a Title IX school proceeding, the Supreme Court and our Circuit have held that the same or similar language requires 'but-for' causation." See *Bostock v. Clayton Cnty*., Ga. , —— U.S. ——, 140 S. Ct. 1731 1739, 207 L.Ed.2d 218 (2020) (... *Sheppard v. Visitors of Va. State Univ*., 993 F.3d 230 (4th Cir. 2021)).

**COUNT II**
**Violation of Title VII (Discrimination & Retaliation)**
**42 U.S.C. § 2000e-3(a) et seq.**
(v. UNC; Cunningham, as Agent for UNC;
Gallo, as Agent for UNC; and Miller as Agent for UNC)

103. All Paragraphs of this pleading are incorporated herein by reference.

104.   Title VII, 42 U.S.C. § 2000e-3(a), states "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by this subchapter ...." *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

105.   "To establish a prima facie case of retaliation under Title VII, a plaintiff must prove: (1) that she engaged in a protected activity, which includes complaining to her superior about sex discrimination or harassment; (2) that her employer took an adverse action against her; and (3) that there was "a causal link between the two events."" *Boyer-Liberto v. Fontainebleau Corp*., 786 F.3d 264, 281 (4th Cir. 2015) (internal quotation marks omitted).

106.   The necessary causal link is between the employee's complaint and the adverse action, not between her sex and the adverse action. See *Wetzel v. Glen St. Andrew Living Cmty*., *LLC* , 901 F.3d 856, 868 (7th Cir. 2018) ("[A]ll anti-retaliation provisions ... provide[ ] protections not because of who people are, but because of what they do."). *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

107.   "Although we have not drawn a bright temporal line, we have observed that two-and-a-half months between the protected activity and the adverse action "is sufficiently long so as to weaken significantly the inference of causation between

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 28 of 51

the two events" in the absence of other evidence of retaliation." *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003). *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

108.   "Alleged additional facts suggesting retaliation, namely Lyons's alleged overreaction in firing Wilcox for insubordination in response to her request for clarification about the attendance policy and time to read the letter of reprimand. A disproportionate response to a minor workplace infraction suggests pretext and can bolster the causation element of a plaintiff's prima facie case." *See*, e.g., *Hernandez v. Fairfax Cnty.*, 719 Fed. App. 184, 189–190 (4th Cir. 2018) (per curiam), *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

109.   Distinctions on the basis of sex or gender are subject to heightened scrutiny under equal protection analysis. *See Knussman v. Maryland*, 272 F.3d 625, 635 (4th Cir. 2001).

110.   "Thus, this Court has recognized that the Equal Protection Clause confers on public employees 'a right to be free from gender discrimination that is not substantially related to important governmental objectives.'" *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir. 1994); *see Davis v. Passman*, 442 U.S. 228, 234–235, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

111.   The Supreme Court has subjected discrimination on the basis of sex to heightened equal protection scrutiny because differences between the sexes are so

rarely a legitimate reason to treat otherwise similarly situated people differently. See *Frontiero v. Richardson*, 411 U.S. 677, 686–687, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) ("[T]he sex characteristic frequently bears no relation to ability to perform or contribute to society."); *Craig v. Boren*, 429 U.S. 190, 198–199, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (recognizing that "classifications by gender" have served as "inaccurate prox[ies]" for other classifications, rooted in stereotypes and "outdated misconceptions" about women). The Court views classifications based on sex or gender with suspicion because of their roots in our Nation's "long and unfortunate history of sex discrimination." *Frontiero*, 411 U.S. at 684, 93 S.Ct. 1764 ; see also *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 273, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) ("Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination."). *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

112. "This is not to say that retaliation can never be evidence of sex discrimination. For example, if a public employer retaliated against women who filed complaints or participated in an investigation but not against men who did the same, the women may have a cognizable Equal Protection Claim. That claim, however, would not be for retaliation but for straightforward sex discrimination,

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 30 of 51

because their employer was treating similarly situated employees differently on the basis of sex. *Wilcox v. Lyons*, 970 F.3d 452 (4th Cir. 2020).

## COUNT III
### Invasion of Privacy (Offensive Intrusion)
### and Civil Conspiracy Damages
(v. UNC; Cunningham, Individually;
Gallo, Individually; and Miller, Individually)

113.   All Paragraphs of this pleading are incorporated herein by reference.

114.   The tort of invasion of privacy, which is defined under North Carolina law "as the intentional intrusion 'physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … [where] the intrusion would be highly offensive to a reasonable person.'" *Curry v. Schletter Inc.,* 2018 WL 1472485, at *4 (W.D.N.C. Mar. 26, 2018). *Walton v. Villines* (W.D.N.C. 2021)

115.   "A civil action for conspiracy is an action for damages resulting from acts committed by one or more of the conspirators pursuant to the formed conspiracy, rather than the conspiracy itself." *Burton v. Dixon*, 259 N.C. 473, 476 (1963); *see Shope v. Boyer*, 268 N.C. 401, 405 (1966)..." *LStar Dev. Grp. v. Vining* (E.D.N.C. 2021)

116.   A civil conspiracy, as a theory of liability, includes the following elements: "(1) a conspiracy, (2) wrongful acts done by certain of the alleged

31

conspirators in furtherance of that conspiracy, and (3) injury as a result of that conspiracy." *Krawiec*, 370 N.C. at 614 (quoting *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 444 (2008)).

117.   "In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts." *Shope v. Boyer*, 268 N.C. 401, 405 (1966); *Reid v. Holden*, 242 N.C. 408, 414-15 (1955). *LStar Dev. Grp. v. Vining* (E.D.N.C. 2021)

118.   "[Plaintiff's] evidence must, at least, reasonably lead to the inference that [Defendants] positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Id. Allen v. Bennett* (M.D.N.C. 2021).

119.   Miller and Glon first conspired to retaliate against Oldham when Glon invaded her privacy by offensive intrusion and disclosed details of her sexual assault and their disbelief in her claim to Miller.

120.   Miller furthered the conspiracy to retaliate against, intimidate and defame Oldham by further disclosing details of her sexual assault and his disbelief in her claim to Cunningham and Gallo.

121.   Cunningham, Gallo, and Miller furthered the conspiracy by making discriminatory and retaliatory comments based on Oldham's sex, female gender stereotypes in the sport of fencing, in UNC's fencing program and beyond, her status as a female who reported being sexually assaulted, and their belief in her status as a

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 32 of 51

whistleblower who questioned the conduct of a male employee and who was therefore deemed to be untrustworthy, all grounded in a female gender bias viewed from the myopic lens of their collective male privilege.

122. Defendants' acts of deceit and chicanery were part of a conspiracy intended to preserve the reputations and resources of Defendants, at the expense of Oldham's right to privacy under North Carolina law.

123. Because UNC was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in it, specifically in their roles as UNC athletic department personnel, Defendant UNC is also liable on a *respondeat superior* basis.

## COUNT IV
## Defamation Per Se and Civil Conspiracy Damages
(v. UNC; Cunningham, Individually;
Gallo, Individually; and Miller, Individually)

124. All Paragraphs of this pleading are incorporated herein by reference.

125. To recover for defamation in North Carolina, Plaintiff must allege that Defendants "caused injury to [Plaintiff] by making false, defamatory statements of or concerning [Plaintiff], which were published to a third person." *Craven v. COPE*, 188 N.C.App. 814, 816 (2008). To constitute defamation, the alleged statement must be "injurious to the reputation of the plaintiffs." *Tyson v. L'Eggs Prods., Inc*., 84

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 33 of 51

N.C.App. 1, 12 (1987). *Church Ekklasia Sozo, Inc. v. CVS Health Corp.* (W.D. N.C. 2021)

126.   "North Carolina retains two distinct defamation torts: the tort of libel encompasses written publications that include purportedly defamatory statements, while slander refers to oral statements. *Esancy v. Quinn*, No. 5:05cv26, 2006 WL 322607, at *3 (W.D. N.C. Feb. 10, 2006)." *Church Ekklasia Sozo, Inc. v. CVS Health Corp.* (W.D. N.C. 2021)

127.   Slander per se is a false oral communication that amounts to (1) an accusation that the plaintiff committed a crime involving moral turpitude, (2) an allegation that impeaches the plaintiff in his trade, business, or profession, or (3) an imputation that the plaintiff has a loathsome disease. *Barker v. Kimberly-Clark Corp.,* 136 N.C.App. 455, 459 (2000). In either case, a prima facie presumption of malice and a conclusive presumption of damage arises, obviating the need for the plaintiff to plead and prove special damages. Id. at 460. *Church Ekklasia Sozo, Inc. v. CVS Health Corp.* (W.D.N.C. 2021)

128.   While Plaintiffs are not required to set forth the allegedly defamatory statement in their Complaint verbatim, "the words attributed to [CVS] must be alleged 'substantially' *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory." *Mbadiwe v. Union Mem'l*

*Reg'l Med. Ctr., Inc.,* No. 3:05CV49-MU, 2005 WL 3186949, at *4 (W.D. N.C. Nov. 28, 2005); *see also Bowman*, 2015 WL 4508648, at *7 (same). Specifically, Plaintiffs must identify the time and place of each alleged defamatory statement to comply with their pleading obligations. *Orndorff v. Raley*, No. 3:17-CV-00618-GCM, 2018 WL 5284040, at *3 (W.D.N.C. Oct. 24, 2018); *Church Ekklasia Sozo, Inc. v. CVS Health Corp.* (W.D.N.C. 2021)

129.   Miller and Glon conspired to retaliate against Oldham by telling Cunningham, Gallo, and others in the national fencing community that her sexual assault claim was not believable, even after Abashidze was found responsible and sanctioned by SafeSport, USA Fencing and Penn State.

130.   Specifically, defendants shared, expressed, or initiated rumors and falsehoods including the following:

    a.   In May 2018, during UNC's head coach hiring process at UNC, Miller told Cunningham and/or Gallo about Oldham's sexual assault by Abashidze and told them that others in the fencing community did not believe Oldham and therefore she was not telling the truth.

    b.   In August 2018, Cunningham and/or Gallo, discussed in front of or with Miller at UNC that Oldham's involvement in reporting a sexual assault and/or complaining about inappropriate behavior of a sexual

Case 1:22-cv-00513   Document 1   Filed 07/05/22   Page 35 of 51

nature made her an "untrustworthy" person unsuited for employment in any position in the UNC athletics department.

c. Miller spoke with Ariana Klinkov, now Cornell's head fencing coach, around January 2019 at the North American Cup fencing tournament in Charlotte, North Carolina. He spoke to her about Oldham's claim of being sexually assaulted by Abashidze, and Miller told Klinkov that Glon had requested that Miller "see if [he] can do anything about Jennifer," ostensibly to diminish her credibility with others or to impact the outcome of her claims with SafeSport and Penn State against Abashidze.

131. Defendants have defamed Oldham by making false statements to others in the national competitive fencing community by characterizing Webb as the victim of the whistleblowing information received by Cunningham. Specifically, defendants expressed or initiated defamatory statements about Oldham including the following:

a. On or before 29 August 2018, in Chapel Hill, North Carolina, Miller told his spouse, Susun Miller, that he believed Oldham provided the whistle blower information, which Susun Miller then obliquely published in a Facebook post visible to over 1,100 of the Millers'

followers in a post on 29 August 2018 appended to a photo meme stating: "Some people create their own storms and then get mad when it rains." Susun Miller's published personal statement attached to the photo said:

> "Wednesday rant: Folks who sabotage anything: people / jobs / spirit, for personal recognition and gain, then want to be seen as a big supporter of said 'things', will face Karma, if not a judge and jury. Beware of one with two faces; destroying lives as they climb. Clue: They are devious, and also play the role of 'poor me' victim. We are watching you in hopes some form of light transmutes you, and also shines on the people in your way.

b. In mid-August 2018, at UNC, Miller and/or Gallo and/or Cunningham disclosed details of their interaction with Webb to Jim Murray, a UNC volunteer assistant coach and close friend of Miller's. Murray then shared the information he received from the UNC staff with Don Alperstein, a USA Fencing Board of Directors member in January 2019 at a North American Cup ("NAC") fencing event in Charlotte, North Carolina. According to Alperstein, the disclosure by Murray characterized the conversation with Webb as an unwarranted overreaction to the whistleblower information ostensibly received from Oldham: "They sat him in a room, asked if

[Webb had] slept with an athlete and said thank you very much, and that was it!"

    c.   In approximately August 2018, Miller approached Peter Burchard, then-President of the United States Coaching Association, and told him that "Jen is fumbling with my coaching line-up."

132.   By making these false and defamatory statements, Defendants intended to destroy Oldham's reputation, standing, and employment prospects at UNC and elsewhere in the fencing community.

133.   Defendants were aware their false and defamatory statements were being spread to others and did nothing to stop it or mitigate the damage.

134.   Defendants have thus harmed Oldham in her trade or profession, and have otherwise subjected her to ridicule, contempt, or disgrace. Accordingly, they are liable for defamation *per se.*

135.   Because UNC was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in such defamation, specifically in their roles as UNC athletic department personnel, Defendant UNC is also liable on a *respondeat superior* basis.

136.   Defendants' actions and lack of action with regard to their defamation of Plaintiff have caused Oldham to sustain substantial injury, damage, and loss,

including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT V
### Negligent Infliction of Emotional Distress
(v. UNC; Cunningham, Individually;
Gallo, Individually; and Miller, Individually)

137.   All Paragraphs of this pleading are incorporated herein by reference.

138.   To prevail on a claim for a Negligent Infliction of Emotional Distress ("NIED") claim in North Carolina, a Plaintiff must establish the following: (1) Defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause Plaintiff severe emotional distress; and (3) the conduct did in fact cause Plaintiff severe emotional distress. *Johnson v. Scott*, 528 S.E.2d 402, 404 (N.C. Ct. App. 2000) (quoting *Johnson v. Ruark Obstetrics and Gynecology Assoc.*, 395 S.E.2d 85, 97 (N.C. 1990)); *Stephenson v. Carolina Physicians Network Inc.* (W.D.N.C. 2021)

139.   The conduct of UNC, by and through the conduct, consisting of the discriminatory and defamatory acts and/or omissions of the individual Defendants referenced herein, were either negligent and/or grossly negligent as related to the Plaintiff.

140. The discriminatory and defamatory acts and/or omissions of the individual Defendants referenced herein were either negligent and/or grossly negligent as related to the Plaintiff herein.

141. The discriminatory and defamatory acts and/or omissions of the Defendants referenced herein were in furtherance of the financial interests of UNC and were driven by, among other things, UNC's financial greed and avarice.

142. The discriminatory and defamatory acts and/or omissions of the Defendants referenced herein arose out of a duty or duties that Defendants, individually and collectively, had to Oldham to act in good faith, to make employment decisions without the taint of discrimination or bias, not to retaliate against her for engaging in protected activity, and to respect Oldham's rights under Title IX, Title VII and North Carolina law.

143. Because UNC was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in it, specifically in their roles as UNC athletic department personnel, Defendant UNC is also liable on a *respondeat superior* basis.

144. The discriminatory and defamatory acts and/or omissions of the Defendants referenced herein constituted a breach of duty or duties owed to the Plaintiff by the Defendants, individually and collectively.

145. It was reasonably foreseeable to the Defendants that their discriminatory and defamatory conduct, actions, and/or omissions that constituted a breach of the duty or duties owed to Oldham would cause her severe emotional distress and/or damage if she learned of it.

146. The discriminatory and defamatory conduct, acts and/or omissions of the Defendants, individually and collectively, that constituted a breach of their duty or duties to the Plaintiff, did in fact cause severe emotional distress and/or damage to the Plaintiff.

147. Plaintiff has suffered, and continues to suffer, severe emotional and mental distress as a result of Defendants' conduct, including but not limited to: severe stress and anxiety, including anxiety for her own and her husband's careers in fencing; anxiety regarding her livelihood as a fencing club owner; additional stress in managing the anxiety these events have caused her children to experience; loss of sleep; lack of concentration and inability to perform work tasks, due to the enormous distraction caused by these circumstances; feelings of intense grief and betrayal at the loss of friendships, professional peers; feelings of depression, despair, and humiliation.

148. This severe emotional distress and/or damage suffered by the Plaintiff was directly and/or proximately caused by the negligent and/or grossly negligent

discriminatory and defamatory conduct, acts and/or omissions of Defendants and/or each of them.

149.   The Plaintiff has been damaged as more specifically set forth herein and, due to the manner and character of the conduct, acts and/or omissions of the Defendants, and/or each of them, the Plaintiff is entitled to an award of punitive damages.

## COUNT VI
## Negligent Supervision and Training
(v. UNC; Cunningham, as Agent for UNC; and Gallo, as Agent for UNC)

150.   All Paragraphs of this pleading are incorporated herein by reference.

151.   "North Carolina recognizes claims of negligent training based on the general elements of negligence. *Swick v. Wilde*, No. 1:10-cv-303, 2012 WL 3780350, at *30 (M.D.N.C. Aug. 31, 2012) (citing *Floyd v. McGill*, 575 S.E.2d 789, 793-94 (N.C. Ct. App. 2003)." See also *Aleman v. City of Charlotte* (W.D. N.C. 2021)

152.   To make out a claim for negligence, a plaintiff must establish: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) and the breach was an actual and proximate cause of the plaintiff's injury. *Shook v. Lynch*

*& Howard, P.A.*, 563 S.E.2d 196, 197 (N.C. Ct. App. 2002). *Aleman v. City of Charlotte* (W.D.N.C. 2021)

153.   Claims of negligent supervision and training are "grounded in active negligence by the employer." *Nance v. Rowan-Salisbury Bd. of Ed.*, 336 F.Supp.3d 593, 597 (M.D. N.C. 2018) (quoting *Davis v. Matroo*, 2013 WL 5309662, at *5 (E.D.N.C. Sept. 19, 2013)); See also *Corbett v. Perry* (W.D.N.C. August 29, 2021)

154.   To establish a claim for negligent supervision or training under North Carolina law, a plaintiff must prove: (1) the specific negligent act on which the action is founded ... [;] (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; [ ] (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' ...; and (4) that the injury complained of resulted from the incompetency proved. *Beard v. Town of Topsail Beach*, 2021 WL 2638147, at *12 (E.D. N.C. June 25, 2021) (quoting *Medlin v. Bass*, 327 N.C. 587, 590-91 (1990)) (emphasis omitted). *See also Corbett v. Perry* (W.D.N.C. 2021)

155.   "A plaintiff has the burden to prove that the employer knew or had reason to know of the employee's incompetency. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 249-50 (4th Cir. 2000)." *Corbett v. Perry* (W.D.N.C. 2021)

156.   Pursuant to federal law under Title IX, UNC has adopted an institutional policy that requires it to establish procedures to train and supervise its employees, so they comply with its policies related to public safety and sexual misconduct, thereby creating UNC's duty to conduct such training and supervision with reasonable skill and care.

157.   UNC's policy specifically requires that all Athletic Department employees receive annual training on their responsibilities and duties under the UNC PPDHRM and Title IX.

158.   UNC, Cunningham, and/or Gallo neglected their duty and failed to provide adequate annual sexual misconduct policy and Title IX training to all members of the fencing team's coaching staff.

159.   UNC, Cunningham, Gallo and/or Miller neglected their duty and failed to ensure that all members of the athletic department and the fencing team coaching staff were able and willing to comply with the spirit and letter of the University's anti-discrimination and anti-retaliation policies and Title IX.

160.   UNC, Cunningham and/or Gallo neglected their duty and failed to ensure that all members of the athletic department and the fencing team's coaching staff were complying with University policies in the PPDHRM and Title IX, even after being confronted with Plaintiff's reports that they were not.

44

161.   Because UNC was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in it, specifically in their roles as UNC athletic department personnel, Defendant UNC is also liable on a *respondeat superior* basis.

162.   Defendants' actions and lack of action with regard to their duty under UNC's sexual misconduct prevention training and education policy caused Oldham to sustain substantial injury, damage, and loss, including but not limited to mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## COUNT VII
### Negligence and Gross Negligence
### PUNITIVE DAMAGES
(v. UNC; Cunningham, as Agent for UNC and Individually; Gallo, as Agent for UNC and Individually; and Miller, as Agent for UNC and Individually)
Joint and Several Liability

163.   All Paragraphs of this pleading are incorporated herein by reference.

164.   Defendants owed to Plaintiff the duties to keep her safe from retaliation by Cunningham, Gallo and Miller while they were serving in their official capacities as employees of UNC, and when they received her credible reports of sexual harassment, sex discrimination, Title IX retaliation and Title VII employment retaliation, to handle her claims properly and in good faith.

165. Defendants breached their duties of reasonable care to Plaintiff in all of the ways set forth in this Complaint, and in additional ways to be set forth and established at trial.

166. The derogation of these duties by Defendants, individually and collectively, was willful, wanton, and done with a reckless, conscious, and intentional disregard of the rights, health, and well-being of Plaintiff.

167. Further, Defendants, individually and collectively, knew or should have known that their derogation of those duties was likely to result in significant injury and harm to Oldham.

168. Because UNC was aware of this conduct, enabled it, and did nothing to stop their employees from engaging in it, specifically in their roles as UNC athletic department personnel, Defendant UNC is also liable on a *respondeat superior* basis.

169. As a direct and proximate result of the negligence and/or gross negligence of Defendants, individually and collectively, Plaintiff has suffered substantial damage for which Defendants, jointly and severally, should be required to pay as more specifically set forth herein.

170. Based upon the conduct of the Defendants, which was, as alleged, willful and/or wanton, the Plaintiff is entitled to an award of punitive damages.

171.   As alleged herein, Defendants UNC, Cunningham, Gallo, and Miller systematically retaliated against Oldham for her participation in protected activity, to wit, the Abashidze and Glon SafeSport and Penn State investigations, and based on their belief that she was the UNC whistleblower.

172.   To save face and to minimize the consequences for UNC, Miller told his associates in the male-dominated fencing world that he did not believe Oldham's claim about Abashidze, and thereafter spread this false narrative to Cunningham and Gallo and others in the UNC athletics and fencing communities, whereby Miller has been believed, on the basis of his male gender and elevated status in the fencing community.

173.   UNC, Miller, Cunningham, and Gallo have thereby created a continuing hostile environment for Oldham, to the detriment of her career prospects, professional life, mental health and well-being.

174.   Oldham first became aware of Miller's role in August 2021 when she learned of his statements regarding Glon's interference with her UNC application for employment in the official report of the Glon SafeSport investigation.

175.   The harassment and hostility generated by Defendants' acts quickly manifested in Oldham's professional life. When she attended fencing events, she encountered pervasive shunning and hostility from Defendants' friends and

associates. She was excluded from social/networking events. There were repercussions for her students, and the necessity of doing what she could to protect them caused her enormous stress and anxiety. In short, she was subjected to severe, pervasive, and continuing humiliations and interference with her professional life, because of Defendants' retaliatory behavior.

176. Moreover, after UNC, Cunningham, Gallo, and Miller were informed of Oldham's assault and Webb's potential policy violations, each of them initiated and/or enabled retaliation against Oldham in UNC's athletic department to continue unchecked.

177. Having knowledge that UNC employees were creating a hostile environment, with the result that Oldham has had to endure the near-destruction of her fencing career, UNC is responsible on the basis of *respondeat superior.*

178. As previously alleged, all Defendants and agents of UNC conspired to allow this behavior to continue, by agreeing to ignore or disbelieve Oldham's complaint and to blackball her from employment at UNC in order to minimize consequences for the University and the individual Defendants.

179. The conspiracy by Defendants and agents of UNC to commit these unlawful acts of discrimination and defamation has proximately caused Oldham to sustain substantial injury, damage, and loss, including but not limited to mental

anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, jointly and severally, as follows:

180. Compensatory damages for Plaintiff's psychological and emotional distress and damages, loss of standing in her professional community, damage to her business, career, and reputation, and her out-of-pocket expenses incurred in response to these circumstances. These damages arise under the Title IX and Title VII claims, as well as the separate causes of action which stem from state law which the Plaintiff prays the Court allow to be heard under its pendent jurisdiction;

181. Punitive damages;

182. Injunctive relief requiring Defendant UNC to take effective steps to eliminate discrimination and retaliation in its programs and activities for all parties involved, including applicants for employment; to appropriately respond according to established policies to all reported conduct that may constitute sexual harassment, discrimination or retaliation according to established policies; to timely investigate reported conduct that may constitute sexual harassment according to established

49

policies; to mitigate the effects of any hostile environment that may arise from sexual harassment or discrimination according to federal law and regardless of complainant's relationship with the University;

183.    Interest on the damages she is awarded;

184.    Costs; and

185.    Reasonable attorney fees pursuant to 42 U.S.C. § 1988.

186.    Plaintiff further requests that all issues complained of herein be tried by a jury.

Respectfully submitted and filed this the 5th day of July, 2022.

KERSTIN WALKER SUTTON PLLC

/s/ Kerstin Walker Sutton
Kerstin Walker Sutton
Durham, NC 27712-3020
(919) 617-0009
kws@kwsutton.com
NC State Bar No. 30008


LINDSAY LAW, PLLC

/s/ Stephen P. Lindsay
Stephen P. Lindsay
46 Haywood St., Suite 200
Asheville, NC 28701
(828) 551-6446
SPL@lindsaylaw.org
NC State Bar No.13017

50

## CERTIFICATE OF SERVICE

I certify that on 5 July 2022, I caused a true and correct copy of the foregoing Complaint to be served upon all parties and counsel of record via the Court's ECF/CM system.

/s/ *Kerstin W Sutton*

Kerstin Walker Sutton, Esq.