IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JENNIFER OLDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:22cv513 |
| | ) | |
| UNIVERSITY OF NORTH CAROLINA; | ) | |
| LAWRENCE R. CUNNINGHAM, | ) | |
| Individually and as Agent for | ) | |
| UNC; LORENZO GALLOS, JR., | ) | |
| Individually and as Agent for | ) | |
| UNC; RONALD MILLER, | ) | |
| Individually and as Agent for | ) | |
| UNC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff Jennifer Oldham filed this case initially bringing federal and state law claims against Defendants University of North Carolina ("UNC"); Lawrence R. Cunningham, UNC's athletics director; Lorenzo Gallo, Jr., UNC's executive associate athletic director; and Ronald Miller, UNC's former fencing coach (collectively, the "individual Defendants"), arising out of Oldham's unsuccessful attempt to be hired as a UNC fencing coach in 2018-19. (Doc. 1.) Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6), respectively. (Docs. 15, 17.) Oldham opposed the

motions (Docs. 19, 20), and Defendants filed replies (Docs. 22, 23). Before the court ruled on Defendants' motions, Oldham moved to amend her complaint. (Doc. 27.) Defendants oppose any amendment on the grounds of futility. (Doc. 33.) The court held a hearing on the motions on April 24, 2023. For the reasons set forth below, Defendants' motion to dismiss will be granted in part and denied in part, and the motion to amend the complaint will be granted in part and denied in part as futile.

## I. BACKGROUND

The facts are based on the well-pleaded allegations of the complaint, which are accepted as true for purposes of the pending motions and viewed in the light most favorable to Oldham as the non-moving party. Any additional facts contained in the proposed amended complaint are set out where relevant to the discussion.

Oldham owns a private fencing club in Durham County, North Carolina. (Doc. 1 ¶ 11.) She played on UNC's varsity fencing team coached by Defendant Miller as a student and graduated from the university in 1996. (Id.) Thereafter, she formally volunteered as a UNC assistant fencing coach and has competed nationally and internationally in professional fencing. (Id.)

In December 2017, while on a commercial flight from a fencing competition, Oldham was sexually assaulted by George Abashidze, a Pennsylvania State University assistant fencing coach, who is not a party to this case. (Id. ¶ 24.) Oldham alleges that Penn

2

State's head fencing coach, Wieslaw Glon, knew of this assault and failed to report it. (Id. ¶ 25.) She further contends that Glon used his prominent stature in the fencing community to harass her over a period of several months in order to intimidate her from reporting the assault or cooperating with any investigation. (Id.)

Between January and May 2018, Glon disbelieved Oldham's claim, regarded Abashidze as a "nice guy" who would not assault anyone, and was concerned about an investigation launched by SafeSport, a 501(c)(3) designed to create and enforce policies and procedures pursuant to the Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017. (Id. ¶ 29; see id. at 8-9 n.3.) In February 2018, in an effort to prejudice Oldham, Glon reached out to Miller and asked, "[I]s there anything you can do about Jennifer [Oldham]?" (Id. ¶ 27.) Shortly thereafter, in April, Glon advised Oldham that he would not report her assault claim to the Penn State administration. (Id. ¶ 30.)

Nevertheless, on June 30, 2018, and unbeknownst to Oldham, Oldham's husband reported the sexual assault to Penn State authorities. (Id. ¶ 38.) Shortly thereafter, on August 1, SafeSport completed its investigation and issued its finding that Abashidze was responsible for Oldham's sexual assault and suspended him from any USA-sanctioned fencing events. (Id. ¶ 39.) As a result, Abashidze was fired. (Id.) Later that month, Penn State similarly concluded that Abashidze had sexually assaulted

3

Oldham but, according to Oldham, "inexplicably determined that he had not violated any Penn State policies." (Id. ¶ 40.)

Meanwhile, sometime in early 2018, Miller announced his intention to retire as UNC fencing head coach at the end of the season. (Id. ¶ 31.) UNC posted its search for a replacement for Miller on its employment website on May 2, 2018. (Id. ¶¶ 31, 33.) Oldham applied and was interviewed in June 2018 before a hiring panel assembled by Defendant Gallo. (Id. ¶ 35.) According to Oldham, Miller had discussed her application with "Gallo and/or Cunningham and told one or both of them about her claim that Abashidze had sexually assaulted her and [about] the SafeSport investigation." (Id. ¶ 36.)

On August 14, 2018, Defendant Cunningham, UNC's Athletic Director, prepared to announce that Joshua Webb, a UNC assistant coach for several years, would be hired as UNC's new head coach. (Id. ¶ 41.) However, that same day Cunningham received a phone call from a "whistleblower" suggesting that Webb had "engaged in wrongful conduct of a sexual nature with a student-athlete while employed by UNC." (Id. ¶ 42.) Webb admitted to the prior relationship, his offer was rescinded, and his employment was terminated. (Id. ¶¶ 44, 46.)

On August 23, 2018, Oldham received an email from UNC notifying her that she was no longer being considered for an assistant coaching position for which she applied "in 2016." (Id.

4

¶ 48.) However, four days later Oldham received an email from Miller notifying her that everyone who had applied for the head coaching position in May would "automatically be re-considered." (Id. ¶ 49.) On or around the same time, Oldham contends, Miller shared with several others that he believed Oldham was the whistleblower and that she caused "Webb's professional downfall" within the fencing community.[1] (Id. ¶ 50.)

In September 2018, UNC re-posted the openings for both the head and assistant fencing coach positions on its employment website, and Oldham submitted an updated curriculum vitae and application for each. (Id. ¶¶ 51, 53, 57.) According to Oldham, Gallo, at some point during the renewed search for a head coach, revealed to another female head coach candidate that she would not be hired because UNC "would only consider hiring a male UNC fencing alumnus as head coach." (Id. ¶ 55.)[2]

On February 21, 2019, Oldham received an email informing her that UNC had cancelled the assistant coach position for which she

---

[1] In her Equal Employment Opportunity Commission charge of discrimination, Oldham stated she was the whistleblower: "I (Oldham) was interviewed for the Head Coach position on June 4, 2018. I was not selected for the position. On or about August 14, 2018, due to my status as an alumnus and former member of the UNC Fencing team, I had a good faith belief that the Assistant Coach had engaged in a sexual relationship with a student-athlete while employed by UNC, and my attorney shared this information with [UNC]." (Doc. 16-8 at 1.)

[2] At oral argument, Oldham conceded she knew before she read the SafeSport report that UNC had indicated it intended to hire a male to fill the coaching position.

5

had applied.  (Id. ¶ 60.)

In April 2019, UNC announced Matt Jednak, a male UNC fencing alumnus, as the new head fencing coach.  (Id. ¶ 56.)  Also that month, Oldham requested that SafeSport and Penn State investigate Glon's failure to report his knowledge of her assault, as their respective policies required.  (Id. ¶ 61.)

Two years later, on August 16, 2021, SafeSport gave Oldham access to its completed investigation report.  (Id. ¶ 62.) According to Oldham, she learned at that time that SafeSport had interviewed Miller two years earlier, on June 26, 2019, and that Miller had made several disparaging remarks about her.  (Id. ¶¶ 62-63.)  Among those statements were that Glon had told Miller in 2018 he believed she was trying to discredit Penn State to improve her chances to get a job there or at UNC, that she was untrustworthy, and that Cunningham believed she was the whistleblower as to Webb, all to the end that UNC would no longer consider her for a job at its athletic department.  (Id. ¶ 63.)

On September 15, 2021, Oldham filed a charge with UNC's Equal Opportunity and Compliance office ("EOC") alleging possible violations of UNC's anti-discrimination, anti-retaliation, and whistleblower policies by Cunningham, Gallo, and Miller.  (Id. ¶ 65.)  She also complained to SafeSport about possible violations by Miller based on his SafeSport interview.  (Id. ¶ 66.)  Oldham was interviewed by the EOC office in October 2021 and received a

6

"Notice of Right to Sue" letter from the United States Equal Employment Opportunity Commission in April 2022. (Id. ¶¶ 67-68.)

Oldham filed this action on July 5, 2022. (Doc. 1.)[3] That complaint alleges the following claims against Defendants: discrimination and retaliation in violation of Title IX of the Civil Rights Act of 1964, 20 U.S.C. § 1681 et seq. (Count I); discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-3(a) (Count II); invasion of privacy and civil conspiracy pursuant to North Carolina law (Count III); defamation per se and civil conspiracy pursuant to North Carolina law (Count IV); negligent infliction of emotional distress pursuant to North Carolina law (Count V); negligent supervision and training pursuant to North Carolina law (Count VI); and negligence/gross negligence pursuant to North Carolina law (Count VII). Subject matter jurisdiction is premised solely on federal law pursuant to 28 U.S.C. § 1331, with supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. (Id. ¶¶ 2, 4.)

In response to Defendants' motions to dismiss, Oldham moved on February 14, 2023, to file a proposed amended complaint for the purpose of the following: supplement and clarify certain factual

---

[3] On May 27, 2020, Oldham sued Pennsylvania State University, Glon, Harris, and Abashidze in this court alleging Title IX and state law claims, in case number 1:20CV466. The case was transferred to the Middle District of Pennsylvania. Oldham v. Penn. State Univ., 507 F. Supp. 3d 637 (M.D.N.C. 2020).

7

allegations; eliminate the state law tort claim for negligent
supervision and training; drop the federal claims against the
individual Defendants in their individual capacity; drop all
claims against UNC that arise under state law; drop any claim
against UNC for punitive damages; and drop all claims against the
individual Defendants in their official capacity as a UNC employee.
(Doc. 27; Doc. 29 at 2.)

## II. ANALYSIS

### A. Motion to Amend and Motion to Dismiss

Oldham argues the motion to amend should be granted because
it is made early in the proceedings such that it does not cause
prejudice, there is a lack of bad faith, and because the "claims
are well supported by the alleged facts and the law." (Doc. 29 at
4.) Defendants respond that the motion to amend should be denied
because the amendment would be futile and none of the changes
reflect newly learned information, which makes the pleading tardy.
(Doc. 33 at 8-9.)

Where a complaint is properly amended, it supersedes the prior
complaint and becomes the operative pleading. Fawzy v. Wauquiez
Boats SNC, 873 F.3d 451, 455 (4th Cir. 2017). This renders the
original complaint "of no effect." Id. (citation omitted). But
where a plaintiff moves to amend a complaint in response to a
motion to dismiss, the motion to amend has the potential to either
frustrate or moot the resolution of the pending motion to dismiss.

8

The court therefore must exercise some level of discretion in deciding which motions to resolve. Because these two motions are fully briefed and share the same standard of review in part, the court will consider all motions and will not deem the motion to dismiss mooted by the requested amendment.

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), a plaintiff may amend the complaint once as a matter of course within 21 days after the earlier of (1) service of a responsive pleading or (2) service of a motion under Rule 12(b), (e), or (f). After that period, a party may amend only with either the opposing party's written consent or the court's leave. Fed. R. Civ. P. 15(a)(2). The court therefore has the discretion to entertain the pending motion to dismiss, or to consider the motion to amend and then permit the parties to re-brief the motion to dismiss. Foman v. Davis, 371 U.S. 178, 182 (1962) (noting that "the grant or denial of an opportunity to amend is within the discretion of the District Court"). And while district courts have discretion to grant or deny a motion to amend, the Fourth Circuit has interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (citation omitted); Foman, 371 U.S. at 182 (same).

9

"[I]f the proposed change advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend." Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 225 (8th Cir. 1994) (citing Charles A. Wright & Arthur Miller, Fed. Prac. & Proc.: Civil, § 1487, at 637 (1991) (quotation omitted and alterations adopted)); see Joyner v. Abbott Labs, 674 F. Supp. 185, 190 (E.D.N.C. 1987) (same). In determining whether a proposed amended complaint would be futile, the court reviews the proposed complaint under the standard used to evaluate a motion to dismiss for failure to state a claim. Amaya v. DGS Construction, LLC, 326 F.R.D. 439, 451 (D. Md. 2018) (citing Katyle v. Penn National Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011)). Thus, "[a] motion to amend a complaint is futile 'if the proposed claim would not survive a motion to dismiss.'" Pugh v. McDonald, 266 F. Supp. 3d 864, 866 (M.D.N.C. 2017) (quoting James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).

A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a
Rule 12(b)(6) motion, a court "must accept as true all of the
factual allegations contained in the complaint," Erickson v.
Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable
inferences must be drawn in the non-moving party's favor, Ibarra
v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

Rules 12(b)(6) and 15 should be balanced against Federal Rule
of Civil Procedure 8(a)(2), which provides only that a complaint
contain a "short and plain statement of the claim showing that the
pleader is entitled to relief." Rule 12(b)(6), and thus Rule 15,
protect against meritless litigation by requiring sufficient
factual allegations "to raise a right to relief above the
speculative level" so as to "nudge[] the[] claims across the line
from conceivable to plausible." Twombly, 550 U.S. at 555, 570
(2007); see Iqbal, 556 U.S. at 678 (2009). When considering a
Rule 12(b)(6) motion and opposition to a Rule 15 motion to amend,
the court "need not accept as true unwarranted inferences,
unreasonable conclusions, or arguments." Giarratano v. Johnson,
521 F.3d 298, 302 (4th Cir. 2008).

Applying these standards, the court turns to each of Oldham's
claims.

### 1.  Title VII Claims

Title VII makes it unlawful "for an employer . . . to fail or
refuse to hire . . . because of such individual's  . . . sex."  42

U.S.C. § 2000e-2(a)(1). In her initial complaint, Oldham contends in Count II that UNC violated Title VII by discriminating and retaliating against her. (Doc. 1 at ¶¶ 103-112.) In her proposed amended complaint, she separates the Title VII claims into Count III for "Adverse Employment Action Discrimination" and Count IV for "Retaliation." (Doc. 27-1 ¶¶ 117-128.) Count III claims an "adverse employment action" based on sex. (See Doc. 27-1 ¶¶ 117-20.) Oldham alleges that "if a public employer retaliated against women who filed complaints or participated in an investigation but not against men who did the same, the women may have a cognizable Equal Protection Claim" that "would not be for retaliation but for straightforward sex discrimination." (Id. ¶ 120.) Thus, she alleges, UNC "treat[ed] similarly situated employees differently on the basis of sex." (Id.)[4] In Count IV, labeled "retaliation," Oldham alleges that UNC believed she participated in the protected activities of the SafeSport investigation, the Penn State investigation, and whistleblowing as to Webb, and that as a consequence UNC viewed her as "untrustworthy," precluded from ever working for the university, and ineligible for the coaching

---

[4] Because Oldham concedes that she cannot proceed against the individual Defendants under Title VII or Title IX (having dropped those claims in her proposed amended complaint (see Doc. 27-1 ¶¶ 117-128)), the court deems the individual Defendants' motion to dismiss (as to the federal claims) unopposed and need not consider them further. See Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009) (holding Title IX does not authorize suit against individuals); Baird ex rel. Baird v. Rose, 192 F.3d 462, 472 (4th Cir. 1999) (holding Title VII does not authorize a remedy against individuals).

Case 1:22-cv-00513-TDS-JEP   Document 41   Filed 06/13/23   Page 12 of 66

positions for which she applied in 2018.  (Id. ¶¶ 121-28.)

To state a cause of action for sex discrimination under Title VII, a plaintiff must show (1) she is a member of a protected group, (2) she applied for a job, (3) she was qualified for the pertinent job, and (4) she was not hired for the position in favor of someone not a member of a protected group due to unlawful circumstances.  Alvarado v. Bd. of Trs., 928 F.2d 118, 121 (4th Cir. 1991).  To state a prima facie case of retaliation pursuant to Title VII, a plaintiff must show "(1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events."  Boyer-Liberto v. Fountainebleau Corp., 786 F.3d 264, 272-73 (4th Cir. 2015) (en banc).  Such claims seek to redress circumstances by which an employer discriminated against an employee who "has opposed any practice made an unlawful employment practice" by Title VII.  Boyer-Liberto, 786 F.3d at 272 (quoting 42 U.S.C. § 200e-3(a)).  Importantly, "retaliatory actions need not 'affect the terms and conditions of employment' to come within Title VII's prohibition," but they must be "materially adverse" such that the retaliatory actions might dissuade a "reasonable worker from engaging in protected activity."  Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018) (citations omitted).  Of course, at the pleading stage, a plaintiff need not state a prima facie case but must state

13

allegations that render such a claim plausible. <u>Swierkiewicz v.</u>
<u>Sorema, N.A.</u>, 534 U.S. 506, 508 (2002).

UNC asserts that Oldham's Title VII claims are time-barred
because she failed to challenge the university's decision not to
hire her within 180 days "'after the alleged unlawful employment
action occurr[ed].'" (Doc. 16 at 10-11 (quoting <u>Walker v. Novo</u>
<u>Nordisk Pharm. Indus., Inc.</u>, 225 F.3d 656 (4th Cir. 2000)); Doc.
33 at 11-12.) Oldham argues that she knew she was not hired in
April 2019 but lacked the factual basis for knowing it was
retaliatory because of sex discrimination until the SafeSport
report was made available to her in August 2021. (Doc. 19 at 23.)

The statute of limitations is an affirmative defense that
must be proven by a defendant by a preponderance of the evidence.
Fed. R. Civ. P. 8(c)(1); <u>Stack v. Abbott Labs., Inc.</u>, 979 F. Supp.
2d 658, 664 (M.D.N.C. 2013). A court can reach the merits of a
limitations issue at the Rule 12(b)(6) stage only "if all facts
necessary to the [statute of limitations] defense 'clearly
appear[] on the face of the complaint.'" <u>Stack</u>, 979 F. Supp. 2d
at 664 (alteration in original) (quoting <u>Goodman v. Praxair, Inc.</u>,
494 F.3d 458, 464 (4th Cir. 2007)).

Title VII provides that a charge of discrimination "shall be
filed within one hundred and eighty days after the alleged unlawful
employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); <u>Hentosh</u>
<u>v. Old Dominion University</u>, 767 F.3d 413, 416-17 (4th Cir. 2014)

14

(overruled on other grounds); E.E.O.C. v. PBM Graphics Inc, 877 F. Supp. 2d 334, 351 (M.D.N.C. 2012). "A discrete retaliatory or discriminatory act 'occur[s]' on the day that it 'happen[s].'" Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002). A refusal to hire is such a discrete act. Lane v. Lucent Technologies, Inc., 388 F. Supp. 2d 590, 598 (M.D.N.C. 2005). While an untimely filing of a charge with the EEOC is not a jurisdictional bar, it is a basis for dismissal by a defendant pursuant to Rule 12(b)(6). Edwards v. Murphy-Brown, L.L.C., 760 F. Supp. 2d 607, 614 (E.D. Va. 2011).

For Title VII cases, it is "notice of the employer's actions, not the notice of a discriminatory effect or motivation, that establishes the commencement of the pertinent filing period." Hamilton v. 1st Source Bank, 928 F.2d 86, 89 (4th Cir. 1990). The Fourth Circuit has made clear in the related context of a discriminatory discharge case that the court counts the 180 days "from either the time of discharge or from the moment the employee received advance notice of the pending discharge." Id. "[L]ack of knowledge of the discriminatory nature of an employment decision and the reasons for that lack of knowledge . . . play no part in determining the beginning of the statutory limitation period." Id. (citing Felty v. Graves-Humphreys Co., 785 F.2d 516, 519 (4th Cir. 1986)).

UNC contends that any Title VII claim accrued in April 2019

15

at the latest when Oldham learned that Jednak was hired instead of her.  (Doc. 16 at 11 (citing Doc. 1 ¶ 56).)  Because Oldham did not file her EEOC charge until December 2021, UNC argues, her Title VII claim is time-barred.  (Doc. 16 at 11 (collecting cases).) UNC further argues that Oldham's 2021 EEOC charge does not raise allegations of Title VII violations after the April 2019 decision and that any such allegations would be barred because they were never exhausted.  (Doc. 16 at 12 (citing <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 963 (4th Cir. 1996).)

Oldham raises three principal arguments in response.  First, she argues that a discovery rule applies to the Title VII claims such that the accrual date began in August 2021 when she received the SafeSport report and learned of the alleged discriminatory nature of UNC's refusal to hire her.  (Doc. 19 at 18-19.)  Until then, she urges, she lacked sufficient facts – namely, Miller's statements - to assert a claim.  (Doc. 19 at 21-22.)  Second, she argues that the Title VII claims should be treated as a continuing violation because UNC's actions constitute a hostile environment through "ongoing discrimination and retaliation" that have cost her job opportunities.  (Doc. 29 at 11-12; <u>see</u> Doc. 19 at 24-25.) Third, she argues that the statute of limitations should be tolled because a UNC assistant coach told her in January 2019 that "Miller rebuffed Glon's request and that Glon's attempted interference was unsuccessful," facts appearing only in the proposed amended

16

complaint.  (Doc. 27-1 ¶ 61; see Doc. 19 at 22 n.2.)

As UNC urges, none of these arguments suffices.  First, under Title VII, it is "notice of the employer's actions, not the notice of a discriminatory effect or motivation, that establishes the commencement of the pertinent filing period."  Hamilton, 928 F.2d at 89 (4th Cir. 1990); see Nat'l R.R. Passenger Corp., 536 U.S. at 109-111 (providing "[t]he requirement, therefore, that the charge be filed 'after' the practice 'occurred' tells us that a litigant has up to 180 or 300 days after the unlawful practice happened to file a charge with the EEOC").  Tort cases applying a discovery rule, to which Oldham analogizes, are thus inapposite.  See, e.g., Nasim v. Warden, Md. House of Corr., 64 F.3d 951, 956 (4th Cir. 1995) (section 1983 case).  Because Oldham knew of UNC's decision not to hire her in April 2019, she had 180 days thereafter to file a charge with the EEOC.  By waiting more than two years to do so, her Title VII claims are plainly time-barred on the face of the complaint and proposed amended complaint.

Second, Oldham's attempt to characterize her claim as a continuing "hostile environment" violation is equally without merit.  She is not a UNC employee such that she could be said to be subject to a hostile work environment.  Rather, her failure to be hired is a discrete act that is easily identified.  Nat'l R.R. Passenger Corp., 536 U.S. at 114 (noting that "discrete acts such as termination, failure to promote, denial of transfer or refusal

17

to hire are easy to identify"). At oral argument, Oldham's counsel cited to paragraph 101 of the proposed amended complaint, which alleges that Defendants Cunningham and Gallo "effectively blackballed [her] from employment in the UNC Athletic Department when they disclosed to Miller that [she] would not be considered for future employment in the UNC Athletic Department." (Doc. 27-1 ¶ 101.) But Oldham does not allege that she has applied for any employment with UNC, and no positions are alleged to be open. Moreover, the "continuing ill effects of an original violation" do not constitute a continuing violation. A Soc'y Without A Name v. Virginia, 655 F.3d 342, 348 (4th Cir. 2011). Nor would subsequent failures to hire revive a time-barred failure to hire. Williams v. Giant Food, Inc., 370 F.3d 423, 428-29 (4th Cir. 2004). For these reasons, Oldham's reliance on McCarter v. University of North Carolina at Chapel Hill, Case No. 1:20CV1050, 2021 WL 4482983, at *8 (M.D.N.C. Sept. 30, 2021), is misplaced. There, the court found specific instances of alleged violations that fell within the relevant statutory period, reinforcing that "it is continual unlawful acts, not continual ill effects from an original violation, that constitutes a continuing course of racially discriminatory conduct." Id. at *9. Indeed, the McCarter court dismissed several claims based on acts occurring outside the relevant statutory period as time-barred on that basis. Id.

Finally, while equitable tolling is available in Title VII

18

claims, the Fourth Circuit has held that "because of the importance of respecting limitations periods, equitable tolling is appropriate only 'where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action.'" Kokotis v. U.S. Postal Serv., 223 F.3d 275, 280-81 (4th Cir. 2000); see also Williams, 370 F.3d at 430 n.4 (Title VII case, citing Kokotis). "[E]quitable tolling is 'reserved for those rare instances where – due to circumstances external to the party's own conduct – it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'" Battle v. Ledford, 912 F.3d 708, 718 (4th Cir. 2019) (citations omitted). To prevail on an equitable tolling theory, a plaintiff must allege that a defendant "attempted to mislead" her and that plaintiff "reasonably relied on the misrepresentation by neglecting to file a timely charge." English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987). Equitable tolling, however, "must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." Gayle v. United Parcel Serv., Inc., 401 F.3d 222, 226 (4th Cir. 2005) (quoting Harris v. Hutchinson, 209 F.3d 325, 330 (4th Cir. 2000)).

Here, there are several reasons equitable tolling does not apply to Oldham's Title VII claims. As UNC notes, Oldham's charge never alleged conduct occurring after she was not offered the

coaching position in April 2019, and she has not filed a charge since. (See Doc. 16-8 (EEOC charge).) Thus, any potential claim was not exhausted. Evans, 80 F.3d at 963.

Although Oldham raised the equitable tolling argument at oral argument, moreover, she did not raise the issue in any of her briefing, even though Defendants did. (Compare Doc. 33 at 13-15 with Docs. 19, 20, 29, 34.) In fact, Oldham wrote that "[d]espite the firepower UNC devotes to opposing it, the equitable tolling doctrine is not invoked here." (Doc. 20 at 17.) On this record, that constitutes a waiver. See Hadley v. City of Mebane, 1:18cv366, 2020 WL 1539724, *6 (M.D.N.C. Mar. 31, 2020) (holding that failure by a plaintiff to address arguments in either briefing or responses will constitute waiver) (citing Local Rules 7.2(a) and 7.3(k) (case citations omitted)). And while Oldham stated in her response to Defendants' motion to dismiss that she could add allegations that she was "affirmatively misinformed about the impact of Glon's defamatory communications," (Doc. 19 at 22 n.2) her actual allegation in the proposed amended complaint is only that UNC Assistant Coach Gillian Adynski told her in January 2019, three months before the hiring decision, that "Glon had called him to 'see if [Miller] could do anything about Jennifer'" and that "Adynski told Plaintiff that Miller rebuffed Glon's request and that Glon's attempted interference was unsuccessful" (Doc. 27-1 ¶ 61). Oldham knew she had a claim of sex discrimination stemming

20

from an adverse employment decision in April 2019, three months later, when she was not hired.

This proposed allegation also cannot be said to have misled Oldham as to any of her present claims. It is unrelated to her claim that she was not hired because as a woman she would not fit within UNC's alleged internal plan to hire only male coaches. (See Doc. 27-1 ¶ 60.) Nor could it have misled Oldham as to her claim that she was not hired because of the Defendants' alleged belief that she engaged in protected activity as a whistleblower that, in their view, "reflected poorly on her trustworthiness." (Id. ¶¶ 100, 111, 112.) That is, Oldham alleges that not until the 2021 SafeSport report did she learn that Miller held the belief that her "assault and presumed whistleblowing 'probably did' have an impact" on her not getting the head coaching job, that he did not personally believe Oldham's assault claim, and that he and Cunningham decided they would not consider her for employment after they received the whistleblower information. (Id. ¶ 69.) These revelations are not countered by Glon's alleged statement in January 2019. Finally, Oldham does not allege, in either her initial complaint or her proposed amended complaint, that she relied on the misrepresentation to delay her filing. But even if she had, her belief that UNC was unaffected by Glon's attempted interference cannot be said to have dissuaded her from pursuing her other claims; namely, that UNC felt she was untrustworthy,

21

that UNC would only consider a male candidate, and that UNC decisionmakers did not believe her.[5]

In sum, because Oldham's Title VII claims in both her complaint and proposed amended complaint are time-barred, amendment would be futile. Defendants' motion to dismiss the Title VII claims will therefore be granted.

### 2. Title IX Claim

Title IX provides that "[n]o person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. The statute has been held to provide an implied right of action to an individual benefitted by the law. Cannon v. Univ. of Chicago, 441 U.S. 677 (1979).

Oldham's Title IX claims in the proposed amended complaint rest on several allegations: UNC's decision to fill the head coaching job only with "a male UNC fencing alumnus"; UNC's establishment of hiring criteria that "exactly matched" a predetermined male candidate and could not be met by a female; UNC's discrimination against Oldham between May and September 2018 by discussing the belief that she was "untrustworthy" for engaging in protected activities, including being a whistleblower as to

---

[5] Though Oldham alleges that she never told UNC about her involvement in the Penn State and SafeSport investigations, her complaint and amended complaint make plain that Miller and other UNC employees would have known about it through their involvement in the SafeSport investigation upon which Oldham relies to attempt to make her claims timely.

Webb, based on their "male privilege" and gender stereotypes; UNC's discrimination against Oldham because she was a female sexual assault victim; UNC's failure to report whistleblower information to UNC's EOC office; and UNC's decision not to consider Oldham for future employment based on perceptions of Oldham as a sexual assault victim, a UNC whistleblower, and a threat to the UNC fencing coaching staff's male status quo. (Doc. 27-1 ¶¶ 88-105 (Count I) and 106-116 (Count II).)[6]

UNC argues that Oldham's claims are time-barred under the three-year statute of limitations applied to Title IX as borrowed from North Carolina's personal injury law. (Doc. 16 at 12 (citing Wilmink v. Kanawha Cnty. Bd. Of Educ., 214 F. App'x 294, 296 n.3 (4th Cir. 2007); N.C. Gen. Stat. § 1-52(16); and Rouse v. Duke Univ., 535 F. App'x 289, 294 (4th Cir. 2013)).) UNC also argues that the allegations of the complaint and amended complaint set out that Oldham's Title IX claims accrued upon her April 2019 rejection for the coaching position, which was more than three years before the filing of this action. Thus, it argues, her Title IX claims are untimely. (Doc. 16 at 12-14.)

Oldham responds that her claims are not time-barred. She contends that a Title IX claim accrues when she "possesses sufficient facts about the harm . . . that reasonable inquiry will

---

[6] Count I of the initial complaint contains similar, and certainly no fewer, allegations. (Doc. 1.)

reveal [the] cause of action." (Doc. 19 at 20 (citations omitted).) While she knew she was not hired in April 2019, "was aware of certain isolated facts," and "had her suspicions about the UNC hiring process" (id. at 21), she contends that she lacked the factual basis for a Title IX claim "until a 'smoking gun' emerged in the form of Miller's statements in the SafeSport report." (Doc. 19 at 18-21.) Put another way, she argued during the hearing that had she tried to bring a claim earlier, she would have been "laughed out of court." At a minimum, she urges, when she discovered or should have discovered the elements of her cause of action raises questions of fact for a jury to consider. (Id. at 19.)

The Fourth Circuit has held that a Title IX claim has a three-year statute of limitations, as borrowed from North Carolina law. Rouse, 535 F. App'x at 294 (citing Wilmink, 214 F. App'x 294 at 296 n.3)).[7] While state law determines the relevant limitations period, federal law determines when a Title IX claim accrues. Rouse v. Duke University, 869 F. Supp. 2d 674, 683 (M.D.N.C. 2012) (citing Stanley v. Trs. Of the Cal. State Univ., 433 F.3d 1129, 1136 (9th Cir. 2006)). For limitations and accrual purposes, Title IX has been treated like 42 U.S.C. § 1983. See King-White v.

---

[7] Unpublished opinions of the Fourth Circuit are cited only for the weight they generate by the persuasiveness of their reasoning. See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006) (citation omitted).

24

_Humble Indep. Sch. Dist._, 803 F.3d 754, 759 (5th Cir. 2015).
Pursuant to federal law, "a cause of action accrues when the
plaintiff possesses sufficient facts about the harm done to him
that reasonable inquiry will reveal his cause of action." _Doe v._
_Virginia Polytechnic Ins. & State Univ._, 617 F. Supp. 3d 412, 432
(W.D. Va. 2022) (Title IX case citing _Nasim v. Warden, Maryland_
_House of Corr._, 64 F.3d 951, 955 (4th Cir. 1995)). Under this
standard, "[a] plaintiff must know that he has been hurt and who
inflicted the injury." _Id._ (citing _Nasim_, 64 F.3d at 955); _see_
_also_ _A Soc'y Without a Name_, 655 F.3d at 348 (4th Cir. 2011)
(finding that in Fair Housing Act and § 1983 claims, "[a] civil
rights claim accrues when the plaintiff 'knows or has reason to
know of the injury which is the basis of the action'") (citation
omitted). "When the plaintiff becomes aware of these two facts,
he is on inquiry notice and has a duty to inquire about reasonably
discoverable details." _Virginia Polytechnic Ins._, 617 F. Supp. 3d
at 432 (citing _Slaey v. Adams_, No. 1:08cv354, 2008 WL 5377937 (E.D.
Va. Dec. 23, 2008)). At that time the plaintiff has a "complete
and present cause of action." _Wallace v. Kato_, 549 U.S. 384, 388
(2007) (finding in § 1983 claim that plaintiff could have filed
suit for unlawful arrest when arrest occurred subjecting him to
involuntary detention). Though the rule is simply stated, the
Supreme Court has observed, "the answer is not always so simple."
_McDonough v. Smith_, 139 S. Ct. 2149, 2155 (2019).

UNC largely relies on Title VII cases for its position that Oldham's claims are time-barred, arguing that her Title IX employment claim should be treated the same as her Title VII claim. (See Doc. 22 at 9-10.) But Title IX's deadline does not contain the statutory occurrence language found in Title VII. For this reason, UNC's reliance on Hamilton v. 1st Source Bank, 928 F.2d 86 (4th Cir. 1990), where the court held that a claim under the Age Discrimination in Employment Act, 29 U.S.C. § 626(d), which, like Title VII, required a charge to be filed within 180 days of when the unlawful practice "occurred," is misplaced. As is UNC's citation to Jennings v. UNC, 240 F. Supp. 2d 492 (M.D.N.C. 2002), where the court stated that it looks to case law interpreting Title VII for guidance evaluating a Title IX claim. The court merely acknowledged the general rule that any claims pursuant to Title IX based on "discrete acts" that fell outside the limitations period were time barred but claims "based on a single hostile environment practice with at least one constituent act occurring" outside the limitation period were timely. Jennings, 240 F. Supp. 2d at 499-500. Importantly, though, the court found at the motion to dismiss stage that the "facts have not been developed," precluding the court from concluding whether "the violation should have been clear at an earlier time." Id. at 500. As a result, the court declined to determine "what, if any, events are barred by the statute of limitations." Id. UNC further argues that courts have applied

26

the Title VII accrual analysis to Title IX claims. (Doc. 22 at 9-10.) But at least to the extent of the cases UNC cited, they are distinguishable in that they involved attempts to delay the accrual date to when the consequences of employment decisions were felt, which is not the issue here. See Doe v. Va. Polytechnic Inst. & State Univ., 400 F. Supp. 3d 479, 490-91 (W.D. Va. 2019) (holding that Title IX claim accrued when plaintiff learned of sanction and not when sanction later became effective or appeal process ended).

The Supreme Court has distinguished between "a plaintiff's ignorance of his legal rights," which does not affect the accrual date, and a plaintiff's "ignorance of the fact of his injury, or its cause," which does affect accrual. Kubrick, 444 U.S. 111, 122 (1979). In other words, the Court has distinguished between ignorance of the facts, including the injury and its cause, and ignorance of the law. The "critical facts" that start the accrual clock are the injury and who inflicted it. Id. This requires a plaintiff to know both the existence of the injury and causation, that is, "the connection between the injury and the defendant's action." Piotrowski v. City of Houston, 537 F.3d 567, 576 (5th Cir. 2001).

In a Title IX case, the cause of action is against the institution, which is the Defendant. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 640-41 (1999). Here, it is readily apparent that Oldham's Title IX claims against UNC that

27

are related to her non-selection as coach accrued no later than
April 2019 when UNC notified her that she would not be hired for
a coaching position.  (Doc. 16 at 11; see Doc. 1 ¶ 56.)  At that
time, she knew of her alleged injury – UNC's failure to hire her
- and who inflicted that injury – UNC.  Oldham was at least on
inquiry notice by this time.  This encompasses virtually all of
her claims: her claim that UNC decided to fill the head coaching
job only with "a male UNC fencing alumnus"; UNC's establishment of
hiring criteria that could not be met by a female; UNC's alleged
discrimination against Oldham between May and September 2018
because of a belief she was "untrustworthy" for engaging in
protected activities, including being a whistleblower as to Webb,
based on their "male privilege" and gender stereotypes; and UNC's
alleged discrimination against Oldham because she was a female
sexual assault victim.  (Doc. 27-1 ¶¶ 88-105 (Count I) and 106-
116 (Count II).)

     As UNC argues, to accept Oldham's contention that her claims
did not accrue until she discovered information in the August 2021
SafeSport report would ignore facts pleaded in her complaint and,
if accepted, extend indefinitely the time for bringing an action.
On this point, Oldham contended at oral argument that many of the
events alleged in the complaint and proposed amended complaint
were not actually known to her until the SafeSport report, and she
sought permission to file yet another amended complaint to clarify

28

this. However, while that may be true for some (or even many) of her factual allegations, it ignores other allegations. For example, Oldham alleges that, at some unspecified date, she learned that in September 2018, seven months _before_ she was not selected for the coaching job, Gallo had told another candidate she would not be hired because "the Athletics Department's internal plan was that UNC would only consider hiring a male UNC fencing alumnus as head coach." (Doc. 27-1 ¶¶ 59, 60.) Obviously, this allegation alone, which was not contained in the SafeSport report and certainly was not exclusively within the Defendants' knowledge, would subsume all of Oldham's other failure-to-hire discrimination claims and support allegations of a Title IX violation, as it would indicate, if believed, that she was not hired because of her sex. Similarly, Oldham alleges that Miller told a group of 15 to 20 people at a national fencing convention in October 2018 that he surmised Oldham may have been Webb's whistleblower and "implied a nefarious connection" between her application and his belief. (Doc. 27-1 ¶ 54(d).) Oldham does not contend that this information was not known, or could not have been discovered, by her within the statute of limitations period. In fact, at oral argument, her counsel candidly admitted that Oldham learned this information _after_ she began to investigate her claims after reading the SafeSport report (meaning it was not contained in the report), although it could have been discovered earlier. Thus, her argument

29

in her brief that she was "unable to discover the factual basis for all these claims" ignores these factual contentions. (Doc. 19 at 18-19.)

Moreover, Oldham's contention that the SafeSport report, which she read some 28 months after she was not hired, first revealed a sufficient basis for bringing a Title IX claim (id.), is based on specific statements (e.g., that various UNC decisionmakers believed she engaged in protected activity as a whistleblower that, in their view, "reflected poorly on her trustworthiness" (Doc. 27-1 ¶¶ 100, 111, 112) and that Miller held the belief that her "assault and presumed whistleblowing 'probably did' have an impact" on her not getting the head coaching job, that Miller did not personally believe her assault claim, and that Miller and Cunningham decided they would not consider her for employment after they received the whistleblower information (id. ¶ 69)). It is true that this information would have enhanced any Title IX claim she could have brought. But accrual does not depend on when a plaintiff has better evidence or a "smoking-gun," as Oldham puts it. A plaintiff need only have "sufficient facts about the harm done to h[er] that reasonable inquiry will reveal h[er] cause of action." Nasim, 64 F.3d at 955 (finding that "for purposes of a § 1983 claim, a cause of action accrues either when the plaintiff has knowledge of his claim or when he is put on notice — e.g., by the knowledge of the fact of injury and who

30

caused it — to make reasonable inquiry and that inquiry would reveal the existence of a colorable claim"); Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 299-300 (4th Cir. 2010) (noting, in the Title VII context, a "plaintiff does not need a 'smoking gun' to prove invidious intent, and few plaintiffs will have one. Rather, 'circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence'" (citing Desert Palace Inc., v. Costa, 539 U.S. 90, 100 (2003))).

By April 2019, Oldham knew she "ha[d] been hurt and who inflicted the injury." Nasim, 64 F.3d at 955 (citing Kubrick, 444 U.S. at 112-24). She was on inquiry notice, imposing on her "a duty to inquire about the details" of her claim that were reasonably discoverable. Id. "To excuse [her] from promptly [making inquiry] by postponing the accrual of [her] claim would undermine the purpose of the limitations statute." Id. (quoting Kubrick, 444 U.S. at 1230). Indeed, Oldham tacitly acknowledges, as she concedes in her brief, that she "was aware of certain isolated facts" and "had her suspicions about the UNC hiring process." (Doc. 19 at 21.) Even as to her claims of ongoing wrongdoing, she acknowledges "she knew generally that she was suffering from a campaign of defamation, that she was encountering a hostile environment at fencing venues, and that she was effectively blacklisted from collegiate fencing employment."

31

(Doc. 19 at 23 (addressing her state law claims).)  Oldham tries to justify her delay with her contention that "armed with the SafeSport report and Miller's confessions of unlawful retaliation, she was finally in a position to investigate [and] to depose UNC actors who previously would have denied everything but would now be perjuring themselves."  (Id.)  But this is simply wrong.  She was on inquiry notice and knew of sufficient facts about the harm done to her that reasonable inquiry would have revealed her legal cause of action, but she failed to pursue her claim timely.

Even in applying a discovery accrual rule, the Supreme Court has "been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock."  Rotella v. Wood, 528 U.S. 549, 555 (2000).  Oldham knew of her injury in April 2019.  Speculation that deponents might not testify truthfully is not an exception to an accrual rule.  But even if Oldham were correct, she ignores the fact that she learned of the SafeSport report eight months before the three-year statute of limitations expired, yet she failed to file suit against UNC.

Oldham alternatively raises her tolling arguments here as well.  But for the reasons explained in connection with her Title VII claims, they fail as to all of her Title IX grounds alleged that relate to her failure to be hired in April 2019.  If there was any ongoing campaign against her up to April 2019, her Title IX claims as to it accrued on that date.

This conclusion is also supported by Oldham's allegations contained in her lawsuit against Penn State and related officials, filed April 20, 2021, within the limitations period. As UNC notes, these allegations constitute an admission she was aware of Glon's disparaging communications to Miller and his alleged attempts to intervene to oppose her hiring by UNC. In her Pennsylvania action (originally filed in this court), Oldham alleged:

> In January 2019, Oldham was told that Glon had retaliated against her by interfering with her job prospects at UNC, when he called the UNC Fencing Head Coach "to see if he can do anything about Jennifer." She has been given to understand that she would not even be considered for such positions in the present environment, as she is viewed as "radioactive" in the collegiate fencing world.

(Doc. 16-4 at 30 ¶ 98.4)

Oldham responds that these allegations are insufficient to start the accrual clock because she "had no reasonable means of determining [] what effect that intervention had on UNC's decision-making process" and because she received the alleged assurance by UNC that "Glon's disparagement had no effect on the hiring process." (Doc. 19 at 21-22.) But as explained above, the actual alleged assurance (and not the characterization of it in the briefing) was that UNC Assistant Coach Gillian Adynski told her in January 2019, three months before the hiring decision, that "Glon had called him to 'see if [Miller] could do anything about Jennifer'" and that "Adynski told Plaintiff that Miller rebuffed Glon's request and that Glon's attempted interference was

33

unsuccessful." (Doc. 27-1 ¶ 61.) For the reasons noted before, this alleged assurance, taken as true at this pleading stage, does not contradict the statements attributed to the Defendants in the SafeSport report Oldham now cites as a basis for avoiding the statute of limitations. That is, UNC officials could have rebuffed Glon but nevertheless held the views attributed to them in the SafeSport report.

Finally, Oldham relies on <u>Snyder-Hill v. Ohio State University</u>, 48 F.4th 686 (6th Cir.), <u>rehearing denied</u>, 54 F.4th 963 (6th Cir. 2022), to argue that her claims are timely. (Doc. 26.) There, the Sixth Circuit held that plaintiffs' Title IX claims alleging that the university was deliberately indifferent to the sexual abuse a university physician inflicted on them from 1978 to 1996 did not accrue until those plaintiffs learned of the institution's action or inaction after the publication of the results of an independent investigation in 2019. <u>Id.</u> at 706-07. In so doing, the court applied the "discovery rule" to the Title IX claims, noting that the claims did not accrue until the plaintiffs knew or had reason to know that the defendant injured them. <u>Id.</u> at 704. It concluded that because the plaintiffs plausibly alleged that Ohio State engaged in a decades-long cover up by concealing the abuse and their knowledge of it, destroying records, giving the abuser false performance reviews, and actively misleading students, the plaintiffs could not have reasonably

34

discovered Ohio State's conduct even if they had investigated further. See id. at 695, 705-06. In fact, the plaintiffs alleged that most did not know they were abused, as they did not know what was medically appropriate at the time, until 2018. Id. at 706. The court allowed the claims to proceed, even though the individuals were aware that their individual reports of abuse were not addressed, because they allegedly had "no reason to know that the mishandling of their reports was part of a much broader university policy of deliberate indifference." Snyder-Hill, 54 F.4th at 965. Oldham argues that her case is analogous in that until she read the SafeSport report, she did not learn that she suffered a Title IX injury.

Snyder-Hill is distinguishable on at least two grounds.[8] First, many of the student plaintiffs were not even aware that the medical treatment the university physician provided was in fact abuse. 48 F.4th at 707. Here, by contrast, Oldham was aware that

---

[8] Dissents by Judges Guy (panel opinion), Thapar, and Readler (en banc dissent from denial of rehearing, joined by Judge Bush) challenged the propriety of the court's adoption of a discovery rule for Title IX claims. It is also notable that Snyder-Hill reached a different result from that of the Fifth Circuit, which earlier rejected just such an approach. In King-White v. Humble Independent Sch. Dist., 803 F.3d 754 (5th Cir. 2015), the court held that it was not the school's ratification of and deliberate indifference to the alleged abuse that started the accrual clock under Title IX. Rather, "'[a] plaintiff need not know that she has a legal cause of action' for her claim to accrue; 'she need know only the facts that would ultimately support a claim.'" Id. at 762. Awareness for accrual purposes "does not mean actual knowledge," the court stated. Id. [A]ll that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.'" Id. (citation and internal quotation marks omitted).

her application was declined in favor of a male's in April 2019.
Second, the only claim the Snyder-Hill plaintiffs pursued was one
for deliberate indifference by the university, and the court noted
that "discovering that a defendant caused an injury is part of
discovering the injury."  Id. at 702 (referring to Rotella, 528
U.S. at 555-56).  While some of the plaintiffs were aware of the
university physician's misconduct, the court emphasized, a Title
IX claim "is against a school based on the school's actions or
inactions, not the actions of the person who abused the plaintiff."
Id.  Thus, a plaintiff could not have been alerted to protect his
or her rights through a Title IX lawsuit, the court concluded,
"unless they had reason to believe that the *institution* did
something (or failed to do something) that caused their injury."
Id. at 703.  A Title IX claim does not accrue, the court held,
"until the plaintiff knows or has reason to know that the defendant
institution injured them."  Id. at 704 (citation omitted).  Here,
by contrast, Oldham raises no deliberate indifference claim, and
she knew in April 2019 that UNC, the institution, injured her by
rejecting her application in favor of that of a male.

Finally, while virtually all of Oldham's Title IX grounds are
time-barred, two contentions do not appear to be clearly untimely
at this stage: her claim that UNC failed to report whistleblower
information to UNC's EOC office regarding Webb, a UNC assistant
coach; and her claim of an ongoing retaliation of sorts, contending

36

that UNC has decided not to consider her for future employment based on perceptions of her as a sexual assault victim, a UNC whistleblower, and a threat to the UNC fencing coaching staff's male status quo. (Doc. 27-1 ¶¶ 105, 114-16.) As to the first of these, it is not apparent on the face of the pleadings when Oldham knew (or if a discovery rule applies, should have known) of UNC's alleged failure to report Webb to its EOC office. As to the other claim, to the extent UNC's alleged decision was made outside the limitations period, it would be time-barred, for the reasons noted. But the allegation, viewed in the light most favorable to Oldham, as it must at this stage, can be construed also as charging an ongoing decision to blackball her that would fall within the statute of limitations. True, Oldham is not a UNC employee, has not alleged that she subsequently sought any other employment with UNC, and has not alleged any indication of a pending opening. She thus does not appear to be subject to any environment at UNC, much less a hostile one. In fact, she does not seek being hired by UNC as a remedy in this case. (Doc. 27-1 at 47-48.) As to both of these grounds, UNC has not challenged Oldham's claims as not being cognizable under Title IX, raising only timeliness at this stage.

In sum, because Oldham failed to file her complaint within three years of the accrual of her Title IX claim for failure to hire in April 2019, her Title IX claims against UNC will be dismissed as time-barred except to the limited extent her claim is

37

based on her allegations of failure to report Webb internally to UNC's EOC office and, within three years of the complaint, UNC's engagement in retaliation against her.

*   *   *

Oldham may contend that enforcement of statutes of limitations in this fashion will prevent her from pursuing valid claims. As the Supreme Court has stated, however, "statutes of limitations often make it impossible to enforce what were otherwise perfectly valid claims." Kubrick, 444 U.S. at 125. But "that is their very purpose." Id. They are "not simply technicalities." Bd. of Regents v. Tomanio, 446 U.S. 478, 487 (1980). They are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." Railroad Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348-49 (1944). Their enforcement has long been considered to provide "security and stability to human affairs," and they have been deemed "vital to the welfare of society." Wood v. Carpenter, 101 U.S. 135, 139 (1879). This surely may work a substantial hardship on a plaintiff. But such limitations are the prerogative of Congress. Gould v. U.S. Dep't of Health & Hum. Servs., 905 F.2d 738, 747 (4th Cir. 1990) (citing Kubrick, 444 U.S. at 117-19).

38

### 3. State Law Claims

Pursuant to 28 U.S.C. § 1367, because the court has subject matter jurisdiction over the remaining Title IX claim, it may exercise supplemental - or pendent - jurisdiction over Oldham's state law claims that otherwise would not invoke federal jurisdiction. MediGrow, LLC v. Natalie M. LaPrade Med. Cannabis Comm'n, 487 F. Supp. 3d 364, 375-76 (D. Md. 2020). Defendants have moved to dismiss all of the state law claims. Because Oldham has filed a proposed amended complaint, only the claims in that pleading need be considered, and the claims and allegations of the original complaint that are not present in the proposed amended complaint are deemed abandoned. In addition, because the proposed amended complaint eliminates any state law claim against Defendant UNC, with Oldham conceding that UNC enjoys sovereign immunity (Doc. 19 at 15), the state law claims presently name only the individual Defendants.

#### a. Public Official Immunity

As an initial matter, Defendants Cunningham and Gallo[9] argue that they enjoy public official immunity against Oldham's state law claims against them. (Doc. 18 at 13-16.) Oldham responds that she "has amply alleged facts establishing that Defendants' conduct has been corrupt and malicious." (Doc. 20 at 23.) As the

_____

[9] Miller, who is retired, does not raise any defense based on public official immunity to the extent of his prior employment by UNC.

39

individual Defendants point out in reply, however, except for noting that her claim of defamation per se (which cannot serve as the basis for this claim anyway because it is time-barred, as discussed below) presumes malice, Oldham never points to any allegation in her complaint or proposed amended complaint that alleges that these Defendants were malicious, corrupt, or acting outside the scope of their employment. (Doc. 23 at 2-4.)

North Carolina presumes that public officials act fairly, impartially, and in good faith. In re Annexation Ordinance No. 300-X, 284 S.E.2d 470, 472 (N.C. 1981). The doctrine of public official immunity "protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 576 S.E.2d 726, 730 (N.C. Ct. App. 2003). Consequently, public officials "enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. Ct. App. 2000) (citations omitted). To overcome this immunity, a plaintiff must allege and show that the official's conduct falls within an immunity exception, i.e., the conduct is "malicious, corrupt, or outside the scope of official authority." Epps v. Duke, 468 S.E.2d 846, 851-52 (N.C. Ct. App. 1996) (citation omitted); see also Wilcox v. City of Asheville, 730 S.E.2d 226, 230 n.2 (N.C. Ct. App. 2012) (noting that "this Court has previously held that a plaintiff must separately allege

40

the exceptions to public official immunity"); <u>Showalter v. N.C.</u> <u>Dep't of Crime Control and Public Safety</u>, 643 S.E.2d 649, 652 (N.C. Ct. App. 2007) (plaintiff must allege and show that the official's performance of governmental duties involving the exercise of judgment and discretion was corrupt, malicious, or outside the scope of his duties); <u>Mandsager v. Univ. N. C. at Greensboro</u>, 269 F. Supp. 2d 662, 682 (M.D.N.C. 2003) (noting that university department chair and dean could be immune from suit on the basis of public official immunity); <u>Hwang v. Cairns</u>, 882 S.E.2d 153 (N.C. Ct. App. Jan. 17, 2023) (noting that division chief at a UNC-affiliated hospital was entitled to public official immunity against suit in his individual capacity).

Oldham does not contest in her briefing that Cunningham, as UNC's athletics director, and Gallo, as its executive associate athletics director, are public officials in connection with their employment at UNC, a state-funded university. (Doc. 20 at 22-23.) Nowhere in Oldham's complaint or proposed amended complaint does she allege that either acted maliciously, or corruptly, or outside the scope of their official duties.[10] Therefore, both Cunningham and Gallo are entitled to public official immunity for the negligence-based torts – negligent infliction of emotional

---

[10] Oldham's allegation of wanton conduct does not suffice. <u>See</u> <u>Bartley</u> <u>v. City of High Point</u>, 873 S.E.2d 525, 534(N.C. 2022) (malice requires showing of wanton conduct that is not only contrary to the actor's duty but intended to be injurious to another) (citation omitted).

distress (Count V of the complaint and Count VII of the proposed amended complaint) and negligence and gross negligence (Count VII of the complaint and Count VIII of the proposed amended complaint). Because this defect might be remedied by repleading, however, the dismissal of these tort claims against these Defendants is without prejudice. Of course, this immunity does not extend to tort claims based on intentional conduct. <u>Wells v. N. C. Dep't of Correction</u>, 567 S.E.2d 803, 812-13 (N.C. Ct. App. 2002) (citing <u>Hawkins v. State</u>, 453 S.E.2d 233, 242, <u>disc. rev. denied</u>, 342 N.C. 188, 463 S.E.2d 79 (1995)); <u>Mandsager</u>, 269 F. Supp. 2d at 681.

### b.    Invasion of Privacy (Offensive Intrusion) and Civil Conspiracy

Count III of the complaint and Count V of the proposed amended complaint allege invasion of privacy and civil conspiracy against Defendants Cunningham, Gallo, and Miller. Oldham alleges that these Defendants conspired to invade her privacy "by intentionally intruding upon [her] private affairs when they discussed and shared information about her participation in investigations related to sexual harassment." (Doc. 27-1 ¶ 130.) According to the proposed amended complaint: Glon and Miller discussed information about her assault and Glon's disbelief in her claim; Miller then disclosed that to Cunningham and Gallo; and then all three of them made comments based on female gender stereotypes and their belief that Oldham was the whistleblower, and thus untrustworthy, based on the

42

"myopic lens of their collective male privilege."  (Id. ¶¶ 132-34.)  Oldham claims she suffered anxiety and depression as a result.  (Id. ¶ 131.)  The individual Defendants argue that this claim is time-barred (Doc. 18 at 16-17), that Oldham fails to allege facts to support a claim that any individual Defendant (as opposed to Glon) invaded her privacy, and any amendment would be futile (Doc. 33 at 19-20, 27).  Oldham argues that these claims (as with all her tort claims) are timely because they "aris[e] from the conspiracy to retaliate against [her]" and are "continuing violations with wrongful acts extending well into the limitations period." (Doc. 20 at 20.)  She also argues that Defendants engaged in a course of conduct to harm her "extending from the time Glon first reached out to Miller in 2018, at least through the second posting of the head coach position September 2018 (and, one may readily infer, beyond that time)." (Doc. 29 at 10.)  In her motion to amend, Oldham fails to address the individual Defendants' arguments as to these claims.

The tort of invasion of privacy under North Carolina law for an offensive intrusion requires an intentional intrusion upon the privacy of the plaintiff that a reasonable person under the same or similar circumstances would find highly offensive.  Miller v. Brooks, 472 S.E.2d 350, 354 (N.C. Ct. App. 1996) (citation omitted).  "Generally, there must be a physical or sensory intrusion or an unauthorized prying into confidential personal

43

records to support a claim for invasion of privacy by intrusion."
Broughton v. McClatchy Newspapers, Inc., 588 S.E.2d 20, 27 (N.C.
Ct. App. 2003) (citing Burgess v. Busby, 544 S.E.2d 4 (N.C. Ct.
App. 2001)). While an "intrusion" does not depend upon "any
publicity given a plaintiff or his affairs but generally consists
of an intentional physical or sensory interference with, or prying
into, a person's solitude or seclusion or his private affairs,"
the North Carolina Court of Appeals has largely confined the tort
to "physically invading a person's home or other private place,
eavesdropping by wiretapping or microphones, peering through
windows, persistent telephoning, unauthorized prying into a bank
account, and opening personal mail of another." Id. at 27-28.
North Carolina's tort is therefore somewhat circumscribed. It
does not recognize an invasion of privacy tort for public
disclosure of private but true facts about a plaintiff. Hall v.
Post, 372 S.E.2d 711, 717 (N.C. 1988) ("[W]e reject the notion of
a claim for relief for invasion of privacy by public disclosure of
true but 'private' facts"). Nor does it recognize a claim of
placing a plaintiff in a false light. Renwick v. News & Observer
Pub. Co., 312 S.E.2d 405 (N.C. 1984) (reversing court of appeals
stating, "[w]e will not expand the tort of invasion of privacy
recognized in this jurisdiction to include 'false light' invasions
of privacy").

    A civil conspiracy is "an agreement between two or more

persons to do an unlawful act or to do a lawful act in an unlawful way that results in damages to the claimant." Jackson v. Blue Dolphin Communications of N.C., L.L.C., 226 F. Supp. 2d 785, 791 (W.D.N.C. 2002) (citation omitted). North Carolina does not recognize a separate civil action for conspiracy, however. Dove v. Harvey, 608 S.E.2d 798, 800 (N.C. Ct. App. 2005) ("[T]here is not a separate civil action for civil conspiracy in North Carolina.") (citations omitted). For a civil conspiracy claim to be legally cognizable, it must be based on "sufficiently alleged wrongful overt acts." Id. (citations omitted).

Against this backdrop, it is clear that Oldham fails to allege facts that are cognizable as to the individual Defendants. Oldham's allegations are contained in a few limited paragraphs of her complaint and proposed amended complaint. In her complaint, she alleges that "Miller and Glon first conspired to retaliate against [her] when Glon invaded her privacy by offensive intrusion and disclosed details of her sexual assault and their disbelief in her claim to Miller" (Doc. 1 ¶ 119); Miller "disclos[ed] details of her sexual assault and his disbelief in her claim to Cunningham and Gallo" (id. ¶ 120); and "Cunningham, Gallo, and Miller furthered the conspiracy by making discriminatory and retaliatory comments based on Oldham's sex, female gender stereotypes in the sport of fencing, in UNC's fencing program and beyond, her status as a female who reported being sexually assaulted, and their belief

45

in her status as a whistleblower who questioned the conduct of a male employee and who was therefore deemed to be untrustworthy, all grounded in a female gender bias viewed from the myopic lens of their collective male privilege" (id. ¶ 121). Her proposed amended complaint is largely the same. There, she alleges that the individual Defendants invaded her privacy "when they discussed and shared information about her participation in investigations related to sexual harassment" (Doc. 27-1 ¶ 130); Glon and Miller "discussed information about her sexual assault and Glon's disbelief in her claim" (id. ¶ 132); Miller "disclos[ed] information about her sexual assault and Glon's disbelief in her claim to Cunningham and Gallo" (id. ¶ 133); and all three individual Defendants "ma[de] comments based on female gender stereotypes and their belief in Plaintiff's status as a whistleblower who questioned the conduct of a male employee and was therefore deemed to be untrustworthy, all grounded in a female gender bias viewed from the myopic lens of their collective male privilege" (id. ¶ 134).

Based on the present and proposed allegations, Oldham fails to state a claim for invasion of privacy as to these individual Defendants. To the extent these allegations rest on disclosure of private facts about her that were nevertheless true – such as her whistleblowing as to Webb, her report of a sexual assault by Abashidze, and the fact that Glon disbelieved her claim - they are

46

expressly disclaimed by <u>Hall</u> as a basis for liability under an invasion of privacy theory.  <u>See</u> <u>Hall</u>, 372 S.E.2d at 717.  In addition, the fact that some of these discussions may have involved private facts concerning Oldham does not give rise to a claim. <u>Broughton</u>, 588 S.E.2d at 27 ("North Carolina does not recognize a cause of action for the invasion of privacy by disclosure of private facts.").  None of these allegations falls within the type of activity the North Carolina courts have recognized as a basis for a claim of invasion of privacy by offensive intrusion. Therefore, the individual Defendants' motion to dismiss on this basis is merited.[11]

Therefore, the individual Defendants' motion to dismiss these claims will be granted, and Oldham's motion to amend the complaint will be denied as futile.

### c.    Defamation Per Se and Civil Conspiracy

Count IV of the complaint and Count VI of the proposed amended complaint allege defamation per se as well as civil conspiracy against Defendants Cunningham, Gall, and Miller.  Oldham sets out specific factual allegations of falsehoods uttered: in May 2018, statements by Miller to "Cunningham and/or Gallo about Oldham's sexual assault claim" and that "others in the fencing community

---

[11] Although not alleged in the complaint or proposed amended complaint, Oldham cites in her brief to N.C. Gen. State 99D-1, which provides a civil cause of action for gender-based interference of one's enjoyment of a constitutional right.  (Doc. 20 at 24.)  She does not argue that this statute provides any distinguishing basis to save her claims.

did not believe Oldham"; in August 2018, discussion by "Cunningham and/or Gallo" with Miller about Oldham's sexual assault claim and a belief Oldham was untrustworthy; on June 26, 2019, statements by Miller to a SafeSport investigator; in January 2019, a conversation between Miller and Arian Klinkov, now a Cornell University fencing coach; "between 28 June and 2 July 2018," a statement by Miller to Peter Burchard at the 2018 USA Fencing National Championships; "[o]n or before 29 August 2018," statements by Miller to his wife, which were then published on Facebook on August 29, 2018; a "mid-August 2018" discussion by Miller about "Cunningham and/or Gallo's interaction with Webb" with a UNC volunteer assistant coach, who then shared that information in January 2019 with a member of the USA Fencing Board of Directors; and in August 2018, a statement by Miller to the then-president of the U.S. Coaching Association that "Jen is fumbling with my coaching line-up."[12]  (Doc. 27-1 ¶¶ 138-45.)  The individual Defendants contend that all these statements are time-barred.  Oldham relies principally on her arguments raised in connection with her invasion of privacy and civil conspiracy claim addressed above.

---

[12] Oldham's use of "and/or" to identify a defendant violates the rule that each defendant is entitled to know exactly what claim is brought against him or her.  See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1128-29 (11th Cir. 2001) (noting that "shotgun pleading" violated Federal Rule of Civil Procedure 8(a)(2)).  As noted herein, several times in Oldham's pleadings she refers to "Cunningham and/or Gallo."

Under North Carolina law, defamation claims for libel and slander carry a one-year statute of limitations. N.C. Gen. Stat. § 1-54(3). A cause of action accrues on the date of publication, irrespective of the date of discovery. Horne v. Cumberland County Hospital System, Inc., 746 S.E. 2d 13, 20 (N.C. Ct. App. 2013) (citations omitted).

Here, the individual Defendants are correct that all alleged incidents of defamation fall well outside the one-year statute of limitations. Her attempts to salvage these claims in the proposed amended complaint by alleging that she did not discover these incidents until sometime within the statute of limitations is of no effect under North Carolina law. Oldham conceded as much during oral argument on these motions, claiming there might be other timely statements not alleged in the complaint. Oldham cannot avoid a motion to dismiss on that basis, however. Thus, the motion to dismiss these claims as to these alleged statements will be granted, and the motion to amend the complaint as to the proposed amended complaint will be denied as futile.[13]

### d. Negligence and Gross Negligence

Count VII of the complaint and Count VIII of the proposed amended complaint allege negligence and gross negligence. Oldham

---

[13] For these reasons, the individual Defendants' arguments that statements made during the SafeSport investigation are protected by a quasi-judicial privilege (Doc. 18 at 18-19) need not be considered.

49

contends that the individual Defendants owed her a duty of "reasonable care and fair dealing" when they received reports of possible sex discrimination under Title VII and Title IX and a duty to handle her claims "respectfully, properly and in good faith." (Doc. 1 ¶ 164; Doc. 27-1 ¶ 156.) She alleges that these Defendants breached their duties "in all of the ways set forth in this Complaint, and in additional ways to be set forth and established at trial." (Doc. 1 ¶ 165; Doc. 27-1 ¶ 157.) In her proposed amended complaint she cites alleged retaliation "from early 2018 through June 2019," which she alleges caused her to suffer harassment and hostility "starting in 2018, three years before she became aware it had been generated by Defendants' acts" in August 2021. (Doc. 27-1 ¶ 166.)

The individual Defendants move to dismiss these negligence claims on several grounds, including lack of duty, statute of limitations, and preemption by Title VII and Title IX. (Doc. 18 at 16-23.) Oldham responds that a "refrain of 'no duty' is the last refuge of tort defendant scoundrels." (Doc. 20 at 28.) She contends that these individual Defendants' duty exists by virtue of the fact that the injury to Oldham was "foreseeable and avoidable through due care." (Id. at 29 (citing Stein v. Asheville City Bd. of Educ., 626 S.E.2d 263, 267 (N.C. 2006).)

As noted above, Defendants Cunningham and Gallo enjoy public official immunity as to negligence claims. Miller has not raised

50

the defense, and so the court will address the merits of Miller's arguments, which also apply to Cunningham and Gallo on an alternative basis.

It is readily apparent that these claims recycle her claims under Title VII and Title IX, recharacterizing them as negligence. For example, this claims in her complaint, which was originally a claim that included Defendant UNC on a <u>respondeat superior</u> theory of liability,[14] she alleges that the individual Defendants had a duty to "keep her safe from retaliation," "systematically retaliated against Oldham," "spread this false narrative [that Miller did not believe Oldham] to Cunningham and Gallo and others in the UNC athletics and fencing communities," "created a continuing hostile environment for Oldham," caused Oldham injury by their "harassment and hostility," and "conspired to allow this behavior to continue." (Doc. 1 ¶¶ 164-179.) To this extent, such claims are preempted by the very federal laws meant to provide a remedy. <u>See, e.g.</u>, <u>Perry v. FTDData, Inc.</u>, 198 F. Supp. 2d 699, 707-08 (D. Md. 2002) (dismissing negligence claim that duplicated allegations of Title VII count as preempted); <u>Cash v. Lees-McRae College</u>, 2018 WL 7297876 *13-14 (W.D.N.C. Aug. 13, 2018) ("To the extent that [plaintiff] alleges that Title IX supplies a duty

---

[14] Because Oldham has withdrawn her tort claims against UNC in recognition of its sovereign immunity, the allegations against UNC in the complaint (e.g., Doc. 1 ¶¶ 168, 171, 173, 176, 177, and 179) need not be considered.

actionable in negligence, she cannot plead such a claim."
(collecting cases)).

Moreover, although she couches her conclusions in negligence
terms, her allegations of misconduct involve intentional acts –
retaliation, interference, harassment, hostility, and conspiracy.
Even in her attempt to amend her claim, she cites instances of
intentional acts of alleged retaliation (e.g., Doc. 27-1 ¶¶ 162-
63, 167), "hostile environment" (id. ¶ 164), and "harassment and
hostility" (id. ¶ 166). However, "[i]ntentional acts cannot form
the basis for a negligence claim." McClean v. Duke University,
376 F. Supp. 3d 585, 617-18 (M.D.N.C. 2019) (collecting North
Carolina Supreme Court cases). While one may plead claims in the
alternative, one cannot commit an intentional act negligently.
See Longworth v. United States, 2022 WL 4587520, *6 (E.D.N.C.
Sept. 29, 2022) ("Under North Carolina law, when a party's actions
amount to an intentional tort, the concept of negligence no longer
applies.") (collecting North Carolina state court cases); see also
McBride v. Monroe Crossing Owner, LLC, 2022 WL 1446674, *1-2
(M.D.N.C. May 6, 2022) (dismissing discrimination claim based upon
"negligence" and collecting cases holding the same); Woodard v.
North Carolina Department of Transportation, 840 S.E.2d 542, 2020
WL 1921738, *2 (N.C. Ct. App. Apr. 21, 2020) (noting "[the North
Carolina] Supreme Court recognizes defamation is 'an intentional
tort'") (citing White v. Trew, 736 S.E.2d 166, 168 (N.C. 2013) and

<u>Dobson v. Harris</u>, 530 S.E.2d 829, 837 (N.C. 2000)); <u>Tillet v.</u>
<u>Onslow Memorial Hosp., Inc.</u>, 715 S.E.2d 538, 540 (N.C. Ct. App.
2011) (noting that North Carolina defines the tort of invasion of
privacy by intrusion into seclusion as the "intentional intrusion
. . . upon the solitude or seclusion of another"). Thus, her
negligence claims attempt to plead that the individual Defendants
negligently committed intentional torts, and thus fail to state a
cognizable claim.[15]

Finally, Oldham's proposed negligence claim alleges that the
individual Defendants owed her a duty to use reasonable care to
"handle her claims" of "possible sex discrimination at UNC"
"respectfully, properly and in good faith." (Doc. 27-1 ¶ 156.)
The individual Defendants argue generally that Oldham has failed
to establish that these Defendants owed her any duty of care. It
is true that the complaint and proposed amended complaint fail to
identify any source of such duty, and Oldham argues only that these

---

[15] To be sure, intentional torts, which are alleged by Oldham, must be
distinguished from acts that may be committed either intentionally or
negligently and thus create a fact question. As noted in <u>McBride v.</u>
<u>Monroe Crossing Owner, LLC</u>, 2022 WL 1446674, *1-2 (M.D.N.C. May 6, 2022),
"[a]llegations of 'inherently intentional conduct . . . cannot form the
foundation of a negligence claim.'" (citation omitted). As noted above,
all of Oldham's factual allegations allege inherently intentional
conduct pursuant to North Carolina or federal law. Oldham does not
allege conduct that requires a fact determination of whether the actions
were committed intentionally or negligently. <u>See, e.g.</u>, <u>McCoy v. North</u>
<u>Carolina Golf and Travel, Inc.</u>, 2020 WL 4937788, *7-8 (E.D.N.C. Aug. 24,
2020) (allowing claims of assault, battery, and, in the alternative,
negligence, to proceed because there was a fact question as to whether
the assault and battery were committed with intent to injure).

individual Defendants had a duty by virtue of the foreseeability of harm to Oldham. (Doc. 20 at 28-29.) There is no need to plumb the depths of the legal scope of a possible duty of care here, however, because Oldham's allegations lack any <u>factual</u> ground to render them plausible. She does not allege that she complained about <u>any</u> "sex discrimination at UNC" before filing her EOC charge. In fact, she concedes that she "did not tell anyone at UNC about her assault or about the SafeSport or Penn State investigations prior to 2021." (Doc. 27-1 ¶ 92; Doc. 27-1 ¶ 123 (stating same).) The only time Oldham alleges she made a claim about possible discriminatory policies at UNC was on September 15, 2021, when she filed her EOC charge complaining about Cunningham, Gallo, and Miller. (Doc. 27-1 at 20.)

As a federal court sitting in diversity and applying North Carolina law, this court is obliged to apply the jurisprudence of North Carolina's highest court, the Supreme Court of North Carolina. <u>See</u> <u>Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.</u>, 296 F.3d 308, 312 (4th Cir. 2002) (citations omitted). When that court has not spoken directly on an issue, this court must "predict how that court would rule if presented with the issue." <u>Id.</u> The decisions of the North Carolina Court of Appeals are the "next best indicia" of what North Carolina's law is, though its decisions "may be disregarded if the federal court is convinced by other persuasive data that the highest court

54

of the state would decide otherwise." Id. (quoting Liberty Mut.
Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir.
1992)). In doing so, "absent a strong countervailing federal
interest," a federal court should not render what may be an
"uncertain and ephemeral interpretation of state law" or suggest
its expansion. Med. Mut. Ins. Co. of N.C. v. Littaua, 35 F.4th
205, 210 (4th Cir. 2022) (quoting Pennhurst State School & Hosp.
v. Halderman, 465 U.S. 89, 122 n. 32 (1984)); see Burris Chem.,
Inc. v. USX Corp., 10 F.3d 243, 247 (4th Cir. 1993) (noting that
federal courts adjudicating issues of state law "rule upon state
law as it exists and do not surmise or suggest its expansion").
Here, Oldham's attempt to fashion a negligence claim premised on
her alleged federal rights and intentional conduct exceeds the
scope of negligence claims recognized by state law.[16]

For these reasons, the individual Defendants' motion to
dismiss Oldham's negligence claims will be granted. Because
Oldham's proposed amended complaint fails to remedy this defect,
her motion to amend the same will be denied as futile; however,
because the court cannot discern whether Oldham could state a
timely claim as against Miller that is not presently alleged or
proposed or a claim against Cunningham or Gallo that properly

---

[16] Whether or not these individual Defendants owed a duty to UNC to handle
her reports of sexual harassment involving herself and Webb is not before
the court.

alleges facts to survive public official immunity, the dismissal of this claim will be without prejudice.[17]

### e. Negligent Infliction of Emotional Distress

Count V of the complaint and Count VII of the proposed amended complaint allege negligent infliction of emotional distress against Cunningham, Gallo, and Miller. Oldham alleges vaguely that the individual Defendants were "negligent and/or grossly negligent" in committing "tortious acts and/or omissions of the individual Defendants referenced herein," referring to the previous 145 paragraphs of the proposed complaint. (Doc. 27-1 ¶ 147.) She then alleges that "[t]he tortious acts and/or omissions [of] Defendants referenced herein were negligently engaged in, despite duties that Defendants, individually and collectively, had to Oldham to act in good faith, to make employment decisions without the taint of discrimination or bias, not to retaliate against her for engaging in protected activity, and to respect Oldham's rights under Title IX, Title VII and North Carolina law." (Doc. 27-1 ¶ 148.) The "tortious acts" are alleged to "constitute[] a breach of duty or duties owed to Plaintiff."

---

[17] In light of the court's ruling, it need not consider the individual Defendants' argument that these claims are also barred by the state's 3-year statute of limitations. See Scott & Jones, Inc. v. Carlton Ins. Agency, Inc., 677 S.E.2d 848, 853 (N.C. Ct. App. 2009) (noting that the 3-year statute of limitations on negligence claims "accrues when the wrong giving rise to the right to bring suit is committed, even though the damages at that time be nominal and the injuries cannot be discovered until a later date" (quoting Harrold v. Dowd, 561 S.E.2d 914, 918 (N.C. Ct. App. 2002))).

56

(Id. ¶ 149.)  She alleges that, as a result, she suffers "severe emotional and mental distress" that includes but is not limited to "severe stress and anxiety," loss of sleep, lack of concentration and inability to perform work tasks, feelings of intense grief and betrayal at the loss of friendships, and feelings of depression, despair, and humiliation.  (Doc. 27-1 ¶ 152.)

The individual Defendants argue that this claim is time-barred and fails to state a claim upon which relief can be granted because, among other reasons, Oldham fails to allege facts to render it plausible that they engaged in negligent conduct, that she suffered severe emotional distress, that any such emotional distress was foreseeable, or that they caused it.  (Doc. 18 at 21-27; Doc. 33 at 22-23.)

Because Defendants Cunningham and Gallo enjoy public official immunity for negligence claims, for the reasons noted, they are immune from this claim as well.  Miller has not raised the defense, however, and so the court will address the merits of the arguments on behalf of Miller and, as an alternative basis, Cunningham and Gallo.

A claim for negligent infliction of emotional distress carries the usual tort-based three-year statute of limitations.  N.C. Gen. Stat. § 1-52(5).  However, North Carolina courts have recognized that "the three-year period of time for [emotional distress] claims does not begin to run (accrue) until the 'conduct

57

of the defendant causes extreme [or severe] emotional distress.'" Russell v. Adams, 482 S.E.2d 30, 33 (N.C. Ct. App. 1997) (quoting Bryant v. Thalhimer Brothers, Inc., 437 S.E.2d 519, 525 (N.C. Ct. App. 1993)). See also Ruff v. Reeves Brothers, Inc., 468 S.E.2d 592, 597 (N.C. Ct. App. 1996) (holding that a cause of action for negligent infliction of emotional distress does not accrue "until the actions of the defendant [do], in fact, cause severe emotional distress" because only at that time is the wrong "complete"). Because the individual Defendants have not demonstrated how the complaint and proposed amended complaint alleges Oldham's injury outside the limitations period, the court declines to consider this basis for dismissal at this time.

The elements of the tort of negligent infliction of emotional distress require that: "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . . , and (3) the conduct did in fact cause the plaintiff severe emotional distress." Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A., 395 S.E.2d 85, 97 (N.C. 1990). "Severe emotional distress" means "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Wrenn v. Byrd, 464 S.E.2d 89, 92 (N.C. Ct. App.

58

1995) (citation omitted) (holding that evidence of "moderate depression" diagnosed by a physician was sufficient to establish severe emotional distress); see Williams v. HomEq Servicing Corp., 646 S.E.2d 381, 384-85 (N.C. Ct. App. 2007) (plaintiffs' uncorroborated testimony that they suffered from chronic depression was insufficient to establish a claim of severe emotional distress at summary judgment stage) (citing Johnson v. Scott, 528 S.E.2d 402, 405 (N.C. Ct. App. 2000) (holding the same)).

The individual Defendants contend that Oldham fails to allege that she suffers from any emotional distress that "manifested itself in diagnosable form." (Doc. 33 at 22-23.) But their citation to Turner v. Thomas does not support the contention that a complaint's allegations must be so specific. 794 S.E.2d 439, 447 (N.C. 2016) (denying motion to dismiss where complaint alleged that plaintiff, who alleged he was falsely charged with a murder, suffered severe emotional distress that manifested itself "in diagnosable form . . . including, inter alia: a. Depression; b. Anxiety; c. Loss of sleep; d. Loss of appetite; e. Lack of concentration; f. Difficulty remembering things; g. Feeling alienated from loved ones; h. Shame; and i. Loss of respect with the community and co-workers"). While claims of emotional distress have become almost commonplace in civil litigation only to be dismissed after discovery, the court cannot say that Oldham's

59

allegations of severe emotional distress do not plausibly state a claim at this early stage.

Although these contentions are insufficient grounds to warrant dismissal at this stage, this claim fails for other reasons.

While a plaintiff need not make out a prime facie case at the pleading stage, to state a claim for negligent infliction of emotional distress a plaintiff must allege more than conclusory statements enumerating the elements of the claim. <u>Cash v. Lees-McRae College Inc.</u>, 2018 WL 7297876 (W.D.N.C. Aug. 13, 2018) (dismissing plaintiff's claims for negligent infliction of emotional distress in the Title IX context at the Rule 12(b)(6) stage because plaintiff only "summarily alleg[ed] the elements of a NIED claim"). A plaintiff must allege facts of negligence to make a claim plausible, as there must be wrongful negligent conduct before there can be negligent infliction of emotional distress. See <u>Demarco v. Charlotte-Mecklenburg Hospital Authority</u>, 836 S.E.2d 322, 342 (N.C. Ct. App. 2019).

Here, Oldham's complaint and proposed amended complaint is hopelessly vague. Oldham merely "incorporates herein by reference" all paragraphs of the pleading. (Doc. 27-1 ¶ 146.) She then refers only to "the tortious acts and/or omissions of the individual Defendants referenced herein" which she contends "were either negligent and/or grossly negligent." (Doc. 27-1 ¶ 147.)

60

Rather than identify particular negligent conduct by particular Defendants, Oldham merely makes conclusory statements that all alleged tortious conduct was committed "negligently" by these Defendants. (Doc. 27-1 ¶ 148.) This is insufficient even under the liberalized Rule 8 pleading standard. See Cash, 2018 WL 7297876, *17 (W.D.N.C. Aug. 13, 2018) (dismissing plaintiff's claims for negligent infliction of emotional distress in the Title IX context at the Rule 12(b)(6) stage for, among other reasons, summarily alleging the elements of a claim).

Moreover, as noted in connection with Oldham's negligence claims, allegations of intentional conduct, even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of a negligent infliction of emotional distress claim. Horne, 746 S.E.2d 13, 19-20 (N.C. Ct. App. 2013) (citing Sheaffer v. Cty. of Chatham, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004)). Where a plaintiff's negligent infliction of emotional distress claim is "premised on allegations of intentional – rather than negligent – conduct," it fails. Id. at 19. Further, "when a plaintiff's complaint alleges acts . . . that are intentional in nature, and simply concludes that the acts were committed negligently, it is insufficient to state a claim for negligent infliction of emotion distress." Sabrowski v. Albani-Bayeux, Inc., 2003 WL 23018827, *5 (M.D.N.C. Dec. 19, 2003). Here, for example, Oldham's proposed complaint alleges the following: "Glon

61

used his prominent stature . . . <u>to harass</u> Oldham" (Doc. 27-1
¶ 31); "Defendants were able <u>to pursue their retaliatory</u> campaign
against Oldham" (<u>id.</u> ¶ 81); "UNC discriminated against Oldham when
it was <u>decided</u> . . .," (<u>id.</u> ¶ 93); "the Athletic Department
<u>established</u> hiring prerequisites . . .," (<u>id.</u> ¶ 94); "[Defendants]
<u>engaged in a series of concerted actions</u> and inactions,"[18] (<u>id.</u>
¶ 103); and "UNC's decisions . . . not to report the whistleblower
information . . . <u>were willfully erroneous</u> and contrary to UNC
policy and federal law" (<u>id.</u> ¶ 105); (<u>see generally</u> <u>id.</u> ¶¶ 88-
105).

Counts II and IV of the proposed amended complaint, moreover,
which allege retaliation under Title IX and VII, require proof of
intentional conduct. <u>See, e.g.,</u> <u>Roberts v. Glenn Industrial Group,</u>
<u>Inc.,</u> 998 F.3d 111, 124 (4th Cir. 2021) (noting that there must be
proof of a decisionmaker's knowledge of a protected activity in a
Title VII retaliation claim and "the employer must have taken the
adverse employment action because the plaintiff engaged in a
protected activity" (quoting <u>Dowe v. Total Action Against Poverty</u>,
145 F.3d 653 (4th Cir. 1998))).  Her intentional tort claims
similarly allege intentional conduct. (<u>See, e.g.,</u> Doc. 27-1 ¶ 135
(alleging invasion of privacy and civil conspiracy: "Defendants'

---

[18] A "concerted inaction" would be an oxymoron.  "Concerted" meaning "to
arrange or contrive (something) by mutual agreement." <u>Concerted</u>, Oxford
English Dictionary,
https://www.oed.com/view/Entry/38169?isAdvanced=false&result=1&rskey=N
gJ8U5& (last visited May 30, 2023).

acts of deceit were part of a conspiracy _intended_ to preserve the reputations and resources of Defendants and UNC, at the expense of Oldham's right to privacy under North Carolina law"); id. ¶ 142 (alleging defamation per se and civil conspiracy: "Defendants intended to destroy Oldham's reputation [by making false and defamatory per se statements]) (emphasis added).)

Oldham's only purported claims of negligence are found in Count VIII of the proposed amended complaint in her claim for negligence and gross negligence. However, as already noted, these allegations do not save Oldham's claims because they are based on intentional, not negligent, conduct (noting that the individual Defendants "systematically retaliated against Oldham" (Doc. 27-1 ¶ 162)) and are preempted by federal law. See, e.g., Perry, 198 F. Supp. 2d at 707-08 (dismissing negligence claim that duplicated allegations of Title VII as preempted). Because Oldham has not pleaded a viable claim for negligence arising from the same facts in Count VIII, the court cannot entertain a claim for negligent infliction of emotional distress on those claims.

For these multiple reasons, the individual Defendants' motion to dismiss the negligent infliction of emotional distress claim (Count V of the complaint) will be granted, and Oldham's motion to amend (Count VII of the proposed amended complaint) will be denied as futile. As with her other negligence claim, however, because the court cannot discern whether Oldham could state a timely claim

63

against Miller that is not presently alleged or proposed or allege facts sufficient to overcome public official immunity, the dismissal of this claim will be without prejudice.

## III. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Defendant UNC's motion to dismiss (Doc. 15) is GRANTED IN PART and DENIED IN PART, and Oldham's motion to amend (Doc. 27) is GRANTED IN PART AND DENIED IN PART as follows:

Oldham's Title VII claim (Count II of the complaint) is DISMISSED WITH PREJUDICE; and her motion to amend to add her Title VII claims of the proposed amended complaint (Counts III and IV of Doc. 27-1) is DENIED as futile;

Oldham's Title IX (Count I of the complaint) is DISMISSED WITH PREJUDICE except as to Oldham's claims that UNC failed to report Webb internally to its EOC office and, within three years of the filing of the complaint, UNC engaged in ongoing retaliation to blackball her from further employment based on perceptions of her as a sexual assault victim, a UNC whistleblower, and a threat to the UNC fencing coaching staff's male status quo (Doc. 27-1 ¶¶ 114-16); and Oldham's motion to amend to add Title IX claims in the proposed amended complaint is DENIED as futile except as to the two grounds for the claims alleged in the proposed amended complaint that the court is presently allowing to continue;

64

Oldham's state law claims against Defendant UNC (Counts III through VII of the original complaint) are DISMISSED WITH PREJUDICE in light of Oldham's concession and withdrawal of the same;

IT IS FURTHER ORDERED that the motion to dismiss by Defendants Cunningham, Gallo, and Miller (Doc. 17) is GRANTED IN PART and DENIED IN PART, and Oldham's motion to amend (Doc. 27) is GRANTED IN PART AND DENIED IN PART as follows:

Oldham's Title VII and Title IX claims (Counts I and II of the complaint) and claim for negligent supervision as against all individual Defendants (Count VI of the complaint) are DISMISSED WITH PREJUDICE insofar as Oldham has conceded and withdrawn them against these individual Defendants;

Oldham's claim of invasion of privacy and civil conspiracy (Count III of the complaint) is DISMISSED WITH PREJUDICE; and Oldham's motion to amend the same (Count V of the proposed amended complaint) is DENIED as futile;

Oldham's claim for defamation (Count IV of the complaint) is DISMISSED WITH PREJUDICE; and Oldham's motion to amend the same (Count VI of the proposed amended complaint) is DENIED as futile;

Oldham's claim for negligent infliction of emotional distress (Count V of the complaint) and negligence and gross negligence (Count VII of the complaint) are DISMISSED WITHOUT PREJUDICE as to Defendants Cunningham, Miller, and Gallo; and Oldham's motion to amend as to the proposed amended complaint (Count VII (negligent

65

infliction of emotional distress) and Count VIII (negligence and gross negligence)) is DENIED WITHOUT PREJUDICE.

                                        /s/   Thomas D. Schroeder
                                        United States District Judge
June 13, 2023